1  MATTHEW D. ZINN (State Bar No. 214587)
   AARON M. STANTON (State Bar No. 312530)
2  SHUTE, MIHALY & WEINBERGER LLP
   396 Hayes Street
3  San Francisco, California 94102
   Telephone:   (415) 552-7272
4  Facsimile:    (415) 552-5816
   Zinn@smwlaw.com
5  Stanton@smwlaw.com

6  Attorneys for Defendants
   County of Alameda and Yesenia Sanchez
7

8

9

10                 **UNITED STATES DISTRICT COURT**

11                 **NORTHERN DISTRICT OF CALIFORNIA**

12                 **SAN FRANCISCO DIVISION**

13

14  | JOSE ANTONIO GARCIA, | Case No. 3:24-cv-3997-RS |
    | --- | --- |
    | Plaintiff, | **DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
    | v. | |
    | COUNTY OF ALAMEDA and YESENIA SANCHEZ, Sheriff of Alameda County, in her official capacity, | Hearing Date:  October 3, 2024<br>Time:              1:30 PM<br>Location:        Courtroom 3, 17th Floor |
    | Defendants. | The Hon. Richard Seeborg |
    | | Trial Date:         None Set |

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................3

INTRODUCTION ..........................................................................................................8

FACTUAL BACKGROUND .............................................................................................10

    A.    Sideshows, including spectators, present a growing hazard to public safety and quality of life in Bay Area communities. ................10

    B.    Prior interventions have not successfully deterred sideshows. ............11

    C.    The Ordinance seeks to protect public safety and improve quality of life by penalizing participating in sideshows as a spectator. ................................................................................................11

    D.    Garcia reports on sideshows but does not state that he has ever attended one. No sideshows have been reported in unincorporated Alameda County since the Ordinance was adopted. ................................................................................................12

PRELIMINARY INJUNCTION STANDARD ........................................................................13

ARGUMENT ................................................................................................................13

  I.    Garcia cannot succeed on the merits of his claims. ...........................13

    A.    The Ordinance is not subject to First Amendment scrutiny. It is a generally applicable regulation of conduct that at most marginally burdens expressive conduct. .................................................13

    B.    If it were subject to First Amendment review, the Ordinance would satisfy intermediate scrutiny. ......................................................19

        1.    If the Ordinance could be said to directly regulate speech, it would be a legitimate and content-neutral time, place, and manner restriction. ...............................................................19

        2.    The Ordinance is a valid regulation of the non-expressive aspect of conduct with expressive and non-expressive elements under *United States v. O'Brien* ....................................29

  II.    Garcia has not shown that he would be irreparably harmed by the Ordinance absent a preliminary injunction. ..................................................30

CONCLUSION ..............................................................................................................32

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

1

# TABLE OF AUTHORITIES

2

3  **FEDERAL CASES**

4  *ACLU v. Alvarez,*
       679 F.3d 583 (7th Cir. 2012)..........................................................................................15
5
   *Animal Legal Defense Fund v. Wasden,*
6       878 F.3d 1184 (9th Cir. 2018)..............................................................................14, 17, 23
7  *Arcara v. Cloud Books, Inc.,*
        478 U.S. 697 (1986)..........................................................................................14, 16, 18
8
   *B & L Prods., Inc. v. Newsom,*
9       104 F.4th 108 (9th Cir. 2024) ...............................................................................14, 23
10 *Baird v. Bonta,*
        81 F.4th 1036 (9th Cir. 2023) ....................................................................................13
11
   *Barnes v. Glen Theatre, Inc.,*
12      501 U.S. 560 (1991)...................................................................................................29
13 *Boardman v. Pac. Seafood Grp.,*
        822 F.3d 1011 (9th Cir. 2016)..............................................................................13, 31
14
   *Branzburg v. Hayes,*
15      408 U.S. 665 (1972)..............................................................................................17, 28
16 *Brown v. Kemp,*
        86 F.4th 745 (7th Cir. 2023) .................................................................................15, 23
17
   *Burson v. Freeman,*
18      504 U.S. 191 (1992)...................................................................................................28
19 *Chestnut v. Wallace,*
        947 F.3d 1085 (8th Cir. 2020)....................................................................................15
20
   *City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
21      596 U.S. 61 (2022)....................................................................................................20
22 *Clark v. Cmty. for Creative Non-Violence,*
        468 U.S. 288 (1984)..............................................................................................19, 25
23
   *Cohen v. Cowles Media Co.,*
24      501 U.S. 663 (1991)...................................................................................................17
25 *Colten v. Kentucky,*
        407 U.S. 104 (1972)..............................................................................................15, 29
26
   *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
27      657 F.3d 936 (9th Cir. 2011).......................................................................................25

28

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

*Disney Enters., Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017)......................................................................13

*Doe v. City of Lafayette*,
    377 F.3d 757 (7th Cir. 2004)....................................................................18

*Hernandez-Gotay v. United States*,
    985 F.3d 71 (1st Cir. 2021) .......................................................................18

*Hill v. Colorado*,
    530 U.S. 703 (2000)..................................................................................24

*HomeAway.com, Inc. v. City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2019)....................................................................14

*Houchins v. KQED, Inc.*,
    438 U.S. 1 (1978).....................................................................................17

*Index Newspapers, LLC v. City of Portland*,
    No. 3:20-cv-1035-SI, 2022 WL 72124 (D. Or. Jan. 7, 2022)....................31

*James v. City of Long Beach*,
    18 F. Supp. 2d 1078 (C.D. Cal. 1998) .......................................................29

*Kreimer v. Bur. of Police*,
    958 F.2d 1242 (3d Cir. 1992) ...................................................................18

*Lopez v. Candaele*,
    630 F.3d 775 (9th Cir. 2010)....................................................................31

*McCullen v. Coakley*,
    573 U.S. 464 (2014).....................................................................19, 20, 21

*Menotti v. City of Seattle*,
    409 F.3d 1113 (9th Cir. 2005)..................................................................25

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983)..................................................................................16

*Mitchell v. Newsom*,
    509 F. Supp. 3d 1195 (C.D. Cal. 2020) ....................................................14

*National Press Photographers Ass'n v. McCraw*,
    90 F.4th 770 (5th Cir. 2024) ..............................................................15, 16

*Nicodemus v. City of South Bend*,
    No. 3:23-cv-744 DRL, 2024 WL 139248 (N.D. Ind. Jan. 12, 2024)..........28

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
    762 F.2d 1374 (9th Cir. 1985)..................................................................31

*Patagonia Corp. v. Bd. of Governors of the Fed. Reserve Sys.*,
    517 F.2d 803 (9th Cir. 1975)....................................................................22

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

*Project Veritas v. Ohio Elec. Comm'n*,
    418 F. Supp. 3d 232 (S.D. Ohio 2019) ............................................................ 21, 29, 30

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ........................................................................................... 14

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ........................................................................................ 20, 21

*Sanchez v. City of Atherton*,
    No. 22-cv-03106, 2023 WL 137475 (N.D. Cal. Jan. 9, 2023) ...................... 15

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ........................................................................................... 14

*Spiraledge, Inc. v. SeaWorld Ent., Inc.*,
    No. 13CV296-WQH-BLM, 2013 WL 3467435 (S.D. Cal. July 9, 2013)..................... 31

*Talk of the Town v. Dep't of Fin. & Bus. Servs.*,
    343 F.3d 1063 (9th Cir. 2003) ......................................................................... 14

*Thalheimer v. City of San Diego*,
    No. 09-cv-2862 IEG, 2010 WL 3489335 (S.D. Cal. Sep. 3, 2010) .............. 31

*Tracy Rifle & Pistol LLC v. Harris*,
    118 F. Supp. 3d 1182 (E.D. Cal. 2015) .......................................................... 32

*United States v. Albertini*,
    472 U.S. 675 (1985) ........................................................................................... 25

*United States v. O'Brien*,
    391 U.S. 367 (1968) .............................................................................. 19, 23, 29, 30

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) .................................................................................. passim

*Western Watersheds Project v. Michael*,
    869 F.3d 1189 (10th Cir. 2017) ...................................................................... 15

*Wright v. City of St. Petersburg*,
    833 F.3d 1291 (11th Cir. 2016) ...................................................................... 18

*Zemel v. Rusk*,
    381 U.S. 1 (1965) ............................................................................................... 16


**STATE CASES**

*City of Seattle v. Abercrombie*,
    85 Wash. App. 393 (1997) ............................................................................... 24

*Foley v. Superior Court*,
    117 Cal. App. 4th 206 (2004) ..................................................................... 18, 27

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

*People v. Bergen*,
    883 P.2d 532 (Colo. App. 1994) ...................................................... 17, 18, 29

*Raef v. App. Div. of Super. Ct.*,
    240 Cal. App. 4th 1112 (2015) ................................................................ passim

*State v. Arnold*,
    557 S.E.2d 119 (N.C. Ct. App. 2001) ................................................................ 18

*State v. Bonilla*,
    131 Conn. App. 388 (Conn. Ct. App. 2011) ........................................................ 18

*State v. Tabor*,
    678 S.W.2d 45 (Tenn. 1984) ................................................................ 18


**FEDERAL STATUTES**

7 U.S.C. § 2156(a)(2) ................................................................ 17


**STATE STATUTES**

Cal. Pen. Code § 413 ................................................................ 17

Cal. Pen. Code § 597.5 ................................................................ 18

Cal. Pen. Code § 597b ................................................................ 18

Cal. Veh. Code § 23109.2 ................................................................ 11

Conn. Gen. Stat. § 53–247(c)(4) ................................................................ 18

Okla. Stat. tit. 21, § 1692.6 ................................................................ 18


**OTHER AUTHORITIES**

Assembly Committee on Transportation, Analysis of AB 1978 (Apr. 22, 2024) ................. 11

US EPA, *Tire Fires* (Feb. 22, 2016) ................................................................ 10


**TREATISES**

Erwin Chemerinsky, *Balancing the Rights of Privacy and the Press: A Reply to Professor Smolla*,
    67 Geo. Wash. L. Rev. 1152 (1999) ................................................................ 28

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

**ALAMEDA COUNTY CODE**

§ 10.40.010 ................................................................................................ 12, 22, 23

§ 10.40.020 ............................................................................................ 12, 16, 21, 22

§ 10.40.030 ...................................................................................................... 12, 21

**MUNICIPAL CODES**

City of Los Angeles Municipal Code § 47.15 .......................................................... 17

City of San Diego Municipal Code § 52.5203 ................................................... 17, 27

City of San Jose Code of Ordinances § 10.50.020 ................................................. 17

City of Santa Clara Municipal Code § 10.06.020 ................................................... 17

City of Santa Rosa Municipal Code § 10-26.040 ................................................... 17

City of Turlock Municipal Code § 4-20-102 .......................................................... 17

County of Sonoma Code of Ordinances § 19-80 .................................................... 17

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

# INTRODUCTION

A cloud of toxic smoke drifts into the faces and lungs of teenagers and young adults lining the intersection. In front of them, a driver spins his car's rear wheels, intentionally burning off the tire's traction. The car takes off; the driver jerks the wheel, sending the rear of the car swinging out wildly. The car passes inches away from the crowd—if they are lucky. The crowd eggs him on. More likely than not, some of the drivers or audience members carry drugs or alcohol; some carry guns. When the police show up, racers and spectators alike drive off at high speeds, hopefully—but not always—avoiding collisions with pedestrians and property. They leave behind garbage, destroyed intersections, and a shattered peace.

That, in essence, is a "sideshow," an exhibition of reckless driving native to the Bay Area. As sideshows have become more common, especially in Oakland and nearby communities, they have involved increasingly dangerous driving, gun violence,[1] looting, arson,[2] and substance use. Many spectators have been injured or killed,[3] either at the scene or in the chaotic aftermath. Sideshows are more dangerous than the sum of their parts—they represent a unique blend of toxic and unlawful behaviors, and spectators are a crucial ingredient. Sideshows exist for the audience; without spectators, there is only a reckless driver.

In 2023, to deter sideshows, Defendant County of Alameda adopted an ordinance that penalized participating in these events as a spectator ("Ordinance"). Specifically, the Ordinance prohibits knowingly being present within 200 feet of a sideshow or the preparations for one for the purpose of observing, watching, or witnessing the sideshow. The Ordinance says nothing about recording, photographing, or speaking at or about sideshows.

---

[1] *See, e.g.,* Hilda Flores, *1 Killed after 'sideshow activity' leads to shooting in San Joaquin County, sheriff's office says* (May 23, 2023), https://www.kcra.com/article/sideshow-activity-deadly-shooting-san-joaquin-county-sheriffs-office/43961651.

[2] Sara Stinson, *Video: Vallejo sideshow ends with looted 7-Eleven* (Feb. 26, 2024), https://www.kron4.com/news/bay-area/video-vallejo-sideshow-ends-with-looted-7-eleven/?ipid=promo-link-block1.

[3] *See, e.g.,* Fox 11, *Orange County man arrested in New Mexico for South LA street takeover death of nursing student* (Jan. 17, 2023), https://www.foxla.com/news/south-la-christmas-street-takeover-arrest-elyzza-guajaca.

8

Plaintiff Jose Antonio Garcia ("Garcia"), also known as Jose Fermoso, reports on traffic safety, including sideshows, for *The Oaklandside*. Although he does not state that he has ever attended a sideshow, he filed this action challenging the Ordinance, alleging that it violates his First Amendment rights to freedom of expression and freedom of the press by, allegedly, interfering with his reporting on sideshows. The present motion seeks a preliminary injunction preventing the County from enforcing the Ordinance against him on the grounds that, as applied to him, the Ordinance allegedly violates freedom of expression.

But the Ordinance does not regulate expression. It prohibits non-expressive *conduct*: attending a sideshow for the purpose of watching the exhibition of dangerous driving. Courts have repeatedly recognized that laws regulating non-expressive conduct are not subject to First Amendment scrutiny at all, even if they incidentally limit expression. Although courts have recognized that audiovisual recording can be protected expression, the Ordinance's effects on recording are solely incidental. The Ordinance prohibits participating in sideshows as a spectator, not speaking or reporting about sideshows. It is therefore not subject to First Amendment review.

Even if the Ordinance were subject to the First Amendment, it is nevertheless valid as either (1) a regulation of the non-expressive aspects of conduct with both non-expressive and expressive elements, or (2) as a content-neutral time, place, and manner restriction. Under either frame, the Ordinance passes intermediate scrutiny because it targets non-expressive participation in sideshows as a spectator because that conduct poses unique threats to public safety and quality of life. The Ordinance says nothing about expressive activity or content, nor was it motivated by a desire to suppress speech. It also leaves open ample channels of communication. Garcia may continue reporting on sideshows: he may interview spectators, drivers, and residents, and he may use video or photographs taken by law enforcement, passersby or neighbors, spectators, remotely operated cameras, or telephoto lenses from beyond the Ordinance's 200-foot boundary. As with any other member of the public, the only thing he may *not* do is participate in a sideshow as a spectator.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

The Ordinance, like other valid laws prohibiting spectating at illegal events such as animal fights, regulates dangerous conduct and not expression. Because the Ordinance is valid, Garcia cannot prevail on the merits of his claims. Moreover, his alleged injury is too speculative to show irreparable harm absent an injunction. The preliminary injunction should therefore be denied.

## FACTUAL BACKGROUND

### A.  Sideshows, including spectators, present a growing hazard to public safety and quality of life in Bay Area communities.

Sideshows present a serious threat to public safety. Spectators at sideshows risk death or injury. Declaration of Fenton Culley in Support of Opposition to Motion for Preliminary Injunction ("Culley Dec."), ¶ 7a. The risks of injury or death stem not only from the cars themselves, but also from the combination of dangerous behaviors associated with sideshows, including gun violence, looting, and arson. *Id.*, ¶ 7b; *see also id.*, ¶ 10 (County law enforcement has recovered numerous firearms during sideshow prevention and response operations). Sideshows also require substantial law enforcement resources, diverting officers from other priorities. *Id.*, ¶ 7d. Spectators and others are often killed or injured when drivers or spectators flee the scene at high speeds after law enforcement arrives. *Id.*, ¶ 7a.

Sideshows also threaten quality of life. They block traffic, causing delays. *Id.*, ¶ 8a. Sideshow events are loud. *Id.*, ¶ 8b; Doc. 15-3, Declaration of Jose Antonio Garcia In Support of Plaintiff's Motion for Preliminary Injunction ("Garcia Dec."), Ex. 2 at 8 ("The screeching tires and revving engines would create a cacophony that would reverberate through the rolling hills."). Smoke from burning tires contains harmful chemicals. Doc. 15-3, Garcia Dec., Ex. 2 at 10 (smoke drifts into nearby homes); *see also* US EPA, *Tire Fires* (Feb. 22, 2016), https://archive.epa.gov/epawaste/conserve/materials/tires/web/html/fires.html (last accessed Aug. 23, 2024). Crowds of spectators trespass, damage property, Doc. 15-3, Garcia Dec., Ex. 2 at 9, and leave garbage, Culley Dec., ¶ 8d. Some locations see multiple sideshows, exposing communities to these hazards repeatedly. *Id.*, ¶ 12.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

**B.    Prior interventions have not successfully deterred sideshows.**

The State and local governments have previously attempted to deter sideshows without much success. In 2002, the Legislature allowed law enforcement to arrest persons engaged in reckless driving and impound their vehicles. *See* Cal. Veh. Code § 23109.2. The City of Oakland has increased enforcement of traffic laws, though its ordinances do not penalize spectators. Doc. 15-3, Garcia Dec., Ex. 2 at 13-14. Oakland has also installed Bott's Dots (ceramic bumps usually used as lane dividers that can complicate stunt-driving) and hardened center-lines in streets to deter sideshows. *Id.* at 15.

Despite these efforts, sideshow activity has increased. The California Highway Patrol received almost 26,000 calls involving sideshow activity in 2020, an approximately 15% increase in calls from 2019. Assembly Committee on Transportation, Analysis of AB 1978 at 3 (Apr. 22, 2024), https://trackbill.com/s3/bills/CA/2023/AB/1978/analyses/assembly-transportation.pdf. In 2023, that increased to over 27,000 calls. *Id.* Bay Area jurisdictions, including the City of Oakland, have struggled to address sideshows. Culley Dec., ¶ 13; Doc. 15-3, Garcia Dec., Ex. 2 at 14 ("Even with all these penalties and enforcement efforts, police say sideshows have only become more frequent and more dangerous."); *id.* at 2 (sideshows "show no sign of slowing" in Oakland). Garcia also acknowledges that infrastructure modifications have not deterred sideshow activity: "a recent Oaklandside investigation into nearly four years of sideshow data from the Oakland Police Department found that those interventions have not stopped people from organizing sideshows." Declaration of Aaron Stanton in Support of Opposition to Motion for Preliminary Injunction ("Stanton Dec."), Ex. B at 5; *see also* Culley Dec., ¶ 14 (sideshow drivers ignored Bott's Dots).

**C.    The Ordinance seeks to protect public safety and improve quality of life by penalizing participating in sideshows as a spectator.**

In light of increasing sideshow activity, and after receiving numerous complaints from residents in the unincorporated County, the Sheriff's Office and a member of the Board of Supervisors sponsored an ordinance prohibiting joining sideshows as a spectator. Culley Dec., ¶¶ 5-6 & Ex. A. The Board adopted the Ordinance in August 2023. *Id.*, ¶ 18.

The materials presented to the Board in support of the Ordinance described the dangers associated with spectating at sideshows. A presentation highlighted deaths and injuries, including those of a nursing student and a toddler, caused by reckless driving and sideshow-related gun violence. Culley Dec., Ex. A at 10. The presentation also described other unlawful acts associated with sideshows, including shootings, vandalism, arson, and destruction of public property. *Id.* at 12, 18.

The Board adopted findings demonstrating the necessity for the Ordinance. Alameda County Code ("ACC") § 10.40.010.[4] The findings state that sideshows involve damage to public property; monopolization of law enforcement resources; drug and alcohol use, reckless driving, gun violence, and vandalism caused by drivers and spectators alike; noise; air pollution; garbage left by crowds; and death and injury to spectators. *Id.*

To prevent these harms, the Ordinance prohibits spectating at sideshows. Specifically, it prohibits knowingly being "present" within 200 feet of a sideshow or the preparations for a sideshow "for the purpose of viewing, observing, watching, or witnessing the sideshow event as it progresses." ACC §§ 10.40.020, 10.40.030.

Notably, the Ordinance emphasizes that spectators *participate* in sideshows. It defines a "sideshow" as an event in which a person blocks a public right-of-way "for the purpose of performing a street race or reckless driving exhibition *for one or more spectator(s).*" ACC § 10.40.020 (emphasis added). The Ordinance recognizes that there is no sideshow without spectators.[5]

**D.  Garcia reports on sideshows but does not state that he has ever attended one. No sideshows have been reported in unincorporated Alameda County since the Ordinance was adopted.**

Garcia reports on sideshows and other traffic safety issues for *The Oaklandside*. Doc. 15-1, Garcia Dec., ¶¶ 2, 9, 10. While Garcia "regularly rel[ies] on photographs, as well as

---

[4] The Alameda County Code is available online at https://library.municode.com/ca/alameda_county/codes/code_of_ordinances.

[5] Independent of the Ordinance's definition, the integral nature of the audience is evident in the name of these events: side*shows*.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

video and audio recordings" in his reporting, *id.* at ¶ 12, he does not state that he has personally attended, filmed, photographed, or recorded a sideshow himself. Rather, he has used police data, *id.* at ¶ 13, post-incident interviews, *id.* at ¶ 16, and images taken by others, *see* Doc. 15-2, Garcia Dec., Ex. 1 at 5; Doc. 15-3, Garcia Dec., Ex. 2 at 4, 7-11, 13, 15.

Since the Ordinance's adoption in 2023, the County Sheriff's Office has not been aware of any reports of sideshows occurring in the unincorporated County. Culley Dec., ¶ 19. The Ordinance has never been enforced. *Id.*, ¶ 20.

## PRELIMINARY INJUNCTION STANDARD

A preliminary injunction must be denied unless the plaintiff establishes that "(1) he is likely to succeed on the merits of his claim, (2) he is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in his favor, and (4) a preliminary injunction is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). The first factor is essential: "a court need not consider the other factors if a movant fails to show a likelihood of success on the merits." *Id.* (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017)). As to the second factor, speculative injury does not justify preliminary injunctive relief; a plaintiff must demonstrate *imminent* threatened injury. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011 (9th Cir. 2016). When the opposing party is the state, the third and fourth factors merge. *Baird*, 81 F.4th at 1080.

## ARGUMENT

**I.    Garcia cannot succeed on the merits of his claims.**

**A.    The Ordinance is not subject to First Amendment scrutiny. It is a generally applicable regulation of conduct that at most marginally burdens expressive conduct.**

The Ordinance does not restrict expression. It prohibits spectators' participation in dangerous "sideshows": exhibitions of reckless driving that threaten harm to all participants—drivers and spectators—and the broader public. The Ordinance is thus a generally applicable regulation of conduct that only incidentally affects speech. It is therefore not subject to review under the First Amendment.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

In *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), the Supreme Court upheld the application of a state nuisance statute to close an adult bookstore that harbored prostitution. *Id.* at 707. The Court rejected the defendant's First Amendment defense even though the state's action plainly curtailed speech by closing a bookstore. While noting that "every civil and criminal remedy imposes some conceivable burden on First Amendment activities," the Court held that "the First Amendment *is not implicated* by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books." *Id.* at 706-07 (emphasis added). Similarly, First Amendment review does not apply to an ordinance prohibiting outdoor fires despite its effect of prohibiting flag burning at a protest, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992), to an ordinance that prohibits providing booking services for unregistered short-term property rentals despite its incidental restriction of advertising, *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 686 (9th Cir. 2019), to statutes prohibiting firearms sales on public property despite their possible effect of preventing pro-gun speech at gun shows, *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 113 (9th Cir. 2024), to suspension of a license for an erotic dancing venue for serving alcohol without a liquor license despite its curtailing expressive dancing, *Talk of the Town v. Dep't of Fin. & Bus. Servs.*, 343 F.3d 1063, 1069-70, 1073-74 (9th Cir. 2003), or to a Covid-19 stay-at-home order despite its requiring closure of tattoo parlors, *Mitchell v. Newsom*, 509 F. Supp. 3d 1195, 1201 (C.D. Cal. 2020). These courts have all recognized that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *HomeAway.com*, 918 F.3d at 685 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011)).

Garcia complains that the Ordinance prohibits his recording of sideshows as part of his journalistic work, claiming that audiovisual recording can be protected expression. Doc. 15, Plaintiff's Notice of Motion and Motion for Preliminary Injunction ("Mot.") at 14 (citing, e.g., *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184, 1203-04 (9th Cir. 2018) ("*ALDF*")). But he then takes a leap further and asserts that the Ordinance's prohibition of joining a sideshow as a *spectator* is itself subject to First Amendment review because mere

viewing "is 'a necessary prerequisite to recording.'" *Id.* (quoting *Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020)). But the cases that found viewing a prerequisite to recording involved observing and recording *police activity*. *Chestnut*, 947 F.3d at 1090 ("Every circuit court to have considered the question has held that a person has the right to record police activity in public."); *Sanchez v. City of Atherton*, No. 22-cv-03106, 2023 WL 137475, at *5 (N.D. Cal. Jan. 9, 2023) (observing *police* is part of recording them).[6] Garcia's cases do not stand for the sweeping proposition that "observing" of any kind is protected expression and not merely conduct that may be regulated as part of general public safety measures. *See Colten v. Kentucky*, 407 U.S. 104, 109-10 (1972) (upholding enforcement of generally applicable "move-on" order pursuant to disorderly conduct statute; rejecting argument that plaintiff's observation of a traffic citation was speech activity).

In fact, courts have expressly refused to classify all "observing" as expressive activity. The recent decision in *National Press Photographers Ass'n v. McCraw*, 90 F.4th 770 (5th Cir. 2024), *cert. petition docketed*, No. 23-1105 (Apr. 11, 2024) reflects the right approach. A state statute prohibited flying drones over particular facilities such as prisons and large sports venues (the "no-fly" proscription) and separately prohibited using drones to "capture an image" of persons or property without their consent. *Id.* at 777-78. Following the line of cases Garcia cites, the court applied First Amendment scrutiny to the latter restriction because it directly regulated recording, but the court *refused* to apply that scrutiny to the no-

---

[6] *Brown v. Kemp*, 86 F.4th 745 (7th Cir. 2023), involved observing hunters, not police officers, but the law in that case "was specifically intended to target the expressive activities" of anti-hunting advocates, expressly including their video recordings, rather than their conduct. *Id.* at 780. In contrast, the Ordinance here is not intended to suppress speech. *See* § I.B.1.a, *infra*. Moreover, in extending First Amendment protection to observing, *Brown* relied on *ACLU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012), which itself involved observation of police. Garcia also cites to *Western Watersheds Project v. Michael*, 869 F.3d 1189 (10th Cir. 2017), which applied the First Amendment to a statute that penalized trespassing for the purpose of collecting data, including notes and photographs. But it was because "[t]he challenged statutes apply *specifically* to the creation of speech" that "they are subject to the First Amendment." *Id.* at 1197 (emphasis added). Indeed, the court suggested the result would have been different if plaintiffs had challenged the state's general trespassing statute. *Id.* Here, the Ordinance does not apply to the creation of speech—it does not prohibit recording, note-taking, or any other expression.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

fly provision. *Id.* at 787-88. The plaintiff argued the no-fly provision was subject to the First Amendment because it "*necessarily* prohibits photojournalists from capturing images from the air over those [restricted] facilities." *Id.* at 788. That is *precisely* Garcia's argument here, too. The court summarily rejected the argument, stating:

> There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right. The right to speak and publish does not carry with it the unrestrained right to gather information.

*Id.* (quoting *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965)). The no-fly provision had "nothing to do with speech, or even expressive activity," and did not implicate the First Amendment. *Id.*

Like the regulations in *Arcara* and similar cases, the Ordinance at most incidentally affects expression. It proscribes spectator participation in sideshows, not expression of any kind. It defines a sideshow as "an occasion where one or more persons, for the purpose of performing a street race or reckless driving exhibition for one or more spectator(s) either blocks or impedes traffic on a street or highway or impedes access to an off-street parking facility." ACC § 10.40.020. Spectators are as much a part of a sideshow as is the reckless driving; the whole purpose of a sideshow is "performing a[n] . . . exhibition for . . . spectators." The Ordinance thus prohibits only *conduct:* attendance at sideshows as a spectator. Indeed, it does not impose a blanket prohibition on knowingly watching or otherwise observing sideshows, as they may still be viewed from 200 feet away. Rather, it prohibits only observing by those "spectators" who are "present" at—i.e., intentionally part of—the sideshow. *Id.* (defining "present" and "spectator"). That this prohibition may incidentally limit a journalist's making audiovisual recordings while attending an illegal sideshow does not subject the Ordinance to the First Amendment.[7]

---

[7] The *Arcara* Court recognized that generally applicable regulations that "impose a disproportionate burden upon those engaged in protected First Amendment activities" could be subject to the First Amendment. 478 U.S. at 704 (citing *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983)). Garcia can make no such claim here: he is the *only* person whose expression has been allegedly inhibited by the Ordinance.

Garcia's claim would open numerous generally applicable statutes to First Amendment scrutiny based on their incidental interference with a journalist's observation. But the First Amendment does not license the press to engage in unlawful activity to gather news. *ALDF*, 878 F.3d at 1190 ("[T]he First Amendment right to gather news within legal bounds does not exempt journalists from laws of general applicability."); *see also Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991) ("[G]enerally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news."); *Branzburg v. Hayes*, 408 U.S. 665, 682-83 (1972) (same). Prohibitions on speeding and reckless driving may prevent the press from documenting high-speed police chases or other subjects of public concern, and yet "driving in violation of traffic laws is not an accepted news or information gathering technique entitled to any special protection." *Raef v. App. Div. of Super. Ct.*, 240 Cal. App. 4th 1112, 1119, 1128 (2015) (upholding statute penalizing "reckless driving . . . committed with the intent to capture an image . . . of another person for a commercial purpose"); *see also People v. Bergen*, 883 P.2d 532, 544-45 (Colo. App. 1994) (reporter was validly subject to statute prohibiting attendance, by anyone, at dogfights). Nor does the First Amendment provide the press a special right of access to places normally closed to the public, such as prisons. *See, e.g.*, *Houchins v. KQED, Inc.*, 438 U.S. 1, 11, 12 (1978) (discussing cases); *see also Branzburg*, 408 U.S. at 684-85 ("Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded.").

Garcia's claim would subject both the County's Ordinance and many similar sideshow prohibitions to the First Amendment.[8] But it would also bring within the First Amendment many unrelated criminal statutes that prohibit attending illegal events as a spectator. *See, e.g.,* 7 U.S.C. § 2156(a)(2) (animal fights); Cal. Pen. Code § 413 (illegal boxing matches),

---

[8] *See, e.g.*, City of San Diego Municipal Code § 52.5203; City of San Jose Code of Ordinances § 10.50.020; City of Los Angeles Municipal Code § 47.15; County of Sonoma Code of Ordinances § 19-80; City of Santa Clara Municipal Code § 10.06.020; City of Turlock Municipal Code § 4-20-102; City of Santa Rosa Municipal Code § 10-26.040.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

§ 597.5 (dog fights), § 597b (animal fights); Okla. Stat. tit. 21, § 1692.6 (cockfights); Conn. Gen. Stat. § 53–247(c)(4) (animal fights); *see also Foley v. Superior Court*, 117 Cal. App. 4th 206, 211 n.2 (2004) (comparing illegal street racing to other such illegal exhibitions). Courts have repeatedly upheld such regulations against First Amendment challenges, including freedom of expression challenges. *See, e.g., Hernandez-Gotay v. United States*, 985 F.3d 71, 80 (1st Cir. 2021) (federal statute prohibiting spectating at animal fighting event did not infringe of freedom of speech or association); *Bergen*, 883 P.2d at 544 (state statute punishing spectating at animal fighting event did not violate reporter's First Amendment rights); *see also State v. Tabor*, 678 S.W.2d 45, 48 (Tenn. 1984); *State v. Arnold*, 557 S.E.2d 119, 122 (N.C. Ct. App. 2001); *State v. Bonilla*, 131 Conn. App. 388, 392 (Conn. Ct. App. 2011).

Finally, contrary to Garcia's argument (Mot. at 13), the fact that sideshows occur on streets and sidewalks does not change the analysis despite some of those areas being considered public fora. In *Wright v. City of St. Petersburg*, 833 F.3d 1291 (11th Cir. 2016), a minister had been arrested in a city park—a traditional public forum—for obstruction of justice, and pursuant to statute, the arresting officer had ordered him not to return to the park for one year. *Id.* at 1293-94. The court rejected Wright's First Amendment challenge, finding that *Arcara,* not the line of cases governing speech restrictions in public fora, controlled. *Id.* at 1295-96 & n.4; *see also Doe v. City of Lafayette*, 377 F.3d 757, 764, 772 (7th Cir. 2004) (applying *Arcara* to hold that an order banning a sex offender from public parks was not subject to the First Amendment; finding public forum doctrine inapplicable). "*Regardless* of the nature of the forum, the First Amendment does not prohibit regulation of non-expressive activity unless the regulation 'impose[s] a disproportionate burden'" on speech, which the Ordinance does not do. *Kreimer v. Bur. of Police*, 958 F.2d 1242, 1263 n.24 (3d Cir. 1992) (quoting *Arcara*, 478 U.S. at 704-05); *see* note 7, *supra*. Participating in a sideshow as a spectator does not become an expressive activity merely because that conduct occurs on a public street.

### B.   If it were subject to First Amendment review, the Ordinance would satisfy intermediate scrutiny.

Because the Ordinance regulates non-expressive conduct without triggering the First Amendment, *see* § I.A, *supra*, the Court need go no further to determine that Garcia's challenge cannot succeed on the merits. But even if the Ordinance did regulate expressive activity, it would be subject to—and survive—intermediate scrutiny.

The Supreme Court applies intermediate scrutiny to laws that regulate expressive conduct or speech not based on or because of its content, but to further other legitimate governmental concerns. *McCullen v. Coakley*, 573 U.S. 464, 477 (2014). For such regulations, courts apply a more relaxed means-ends test than that applicable to content-based regulation: laws must be narrowly tailored to serve significant governmental interests, but they need not be the least restrictive means of advancing those interests. *Ward v. Rock Against Racism*, 491 U.S. 781, 798-800 (1989).

If the Ordinance could be considered a regulation of speech at all, at most, it could qualify as a regulation of the non-expressive aspects of conduct with both expressive and non-expressive elements, which is subject to review under *United States v. O'Brien*, 391 U.S. 367 (1968). If the Ordinance did regulate expression directly, it would be considered a regulation of the time, place, and manner of expression. But under either framework, the Ordinance easily survives intermediate scrutiny. Because the test applied to time, place, and manner laws is more comprehensive, and because the Ordinance satisfies even that test, the County addresses that analysis first.

### 1.   If the Ordinance could be said to directly regulate speech, it would be a legitimate and content-neutral time, place, and manner restriction.

Regulations restricting the time, place, or manner of speech or expressive conduct—including in traditional public fora—pass First Amendment scrutiny if they are content-neutral, narrowly tailored to serve a compelling governmental interest, and if they leave open "ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). The Ordinance readily passes this test. It

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

1  regulates conduct based on its time and place—i.e., within 200 feet of an ongoing or immi-

2  nent sideshow—because of the dangers to public safety and quality of life associated with

3  that conduct, and without reference to the content of any speech. Moreover, it is both nar-

4  rowly tailored and leaves open ample alternatives to communicate information.

5  **a.    The Ordinance is content-neutral.**

6  In analyzing content-neutrality, courts look both to whether the law "draw[s] content-

7  based distinctions *on its face*" and to whether it is "*justified* without reference to the content

8  of the regulated speech." *McCullen*, 573 U.S. at 479-80 (emphasis added). Here, neither the

9  Ordinance on its face nor its justification relates to the content of speech.

10  Facially content-based laws include those that require examination of the "content

11  of the message that is conveyed" to identify a violation. *Id.*; *Reed v. Town of Gilbert*, 576 U.S.

12  155, 163 (2015) (content-based laws "appl[y] to particular speech because of the topic dis-

13  cussed or the message expressed"); *see also City of Austin v. Reagan Nat'l Advert. of Austin,*

14  *LLC*, 596 U.S. 61, 69 (2022) (regulations requiring "an examination of speech only in service

15  of drawing neutral, location-based lines" are content-neutral). In contrast, when a violation

16  depends not on "what [plaintiffs] say," but on "where they say it," the law is content-neutral

17  on its face. *McCullen*, 573 U.S. at 479-80. For example, in *McCullen*, the Court judged a law

18  prohibiting access to a buffer zone around abortion clinics content-neutral because it applied

19  based on speakers' location rather than their message. *Id.* The Court reasoned that one

20  could violate the law "merely by standing in a buffer zone, without displaying a sign or

21  uttering a word." *Id*. While acknowledging that the law's targeting of abortion clinics had

22  "the inevitable effect of restricting abortion speech more than speech on other subjects," *id.*

23  at 480, the Court did not disturb its conclusion that the law was content-neutral: "a facially

24  neutral law does not become content based simply because it may disproportionately affect

25  speech on certain topics." *Id.*

26  Here, the Ordinance's application does not depend on the topic or message of any

27  expression. A violation occurs when an individual knowingly spectates at a sideshow—i.e.,

28  stands within 200 feet for the purpose of observing the sideshow—regardless of any message

20

they intend to convey or any topic they intend to discuss. ACC §§ 10.40.020 & .030. As in *McCullen*, enforcement has nothing to do with whether the individual speaks or what subject they speak about. As long as spectators are knowingly there to watch the sideshow, the Ordinance applies equally to silent spectators, spectators speaking or carrying signs addressing any topic and conveying any message, and spectators like Garcia who are preparing to speak in the future.

Of course, by regulating sideshows, the Ordinance may inevitably have a greater incidental impact on speech about sideshows. But that does not make it content-based. *See McCullen*, 573 U.S. at 480 ("[A] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."). Indeed, an individual standing within 200 feet of a sideshow may advocate for or against sideshows or animal rights or seek recruits to her religion or her book club, all without fear of citation, as long as she is not there for the purpose of observing the sideshow. The Ordinance does not target spectators' expression, if any there be, based on its topic or message; it targets their participation in a dangerous non-expressive event, based on their intentional presence to engage in that event as a spectator. That purpose and effect is content-neutral. *See Project Veritas v. Ohio Elec. Comm'n*, 418 F. Supp. 3d 232, 258 (S.D. Ohio 2019) (law prohibiting undercover reporting of political campaigns was content-neutral because it did not prohibit reporting based on the topic or message, but only based on whether the campaign knew about the reporting).

Courts evaluating content-neutrality must also look to whether the law's justification relates to the content of speech. *Reed*, 576 U.S. at 166. Here, the Ordinance seeks not to suppress speech about sideshows, but to protect public safety and quality of life from threats posed by—and to—spectators at sideshows. The County's concerns are content neutral. *See McCullen*, 573 U.S. at 480; *Ward*, 419 U.S. at 792 (regulation to control noise had nothing to do with content).

The Ordinance's statement of purpose addresses sideshows' damage to infrastructure; diversion of law enforcement resources; reckless driving, drug and alcohol use, and

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

gun violence by drivers *and* spectators; property damage; air pollution; noise; spectators' garbage; disproportionate impacts on disadvantaged communities; and injury and death to spectators. ACC § 10.40.010. None of these factors relates to speech, let alone content.

Garcia argues that the Ordinance is intended to suppress video recording of side-shows. Mot. at 14. But the Ordinance says nothing about recording. Recording, reporting, or speaking are neither elements of a violation nor aggravating factors. *Cf. Patagonia Corp. v. Bd. of Governors of the Fed. Reserve Sys.*, 517 F.2d 803, 813 (9th Cir. 1975) (statute's text is the best evidence of legislative intent). Garcia points instead to one statement in a letter from the Sheriff and a member of the Board of Supervisors noting that spectators often post sideshow videos on social media, which can encourage the activity. Mot. at 14; *see also* Doc. 15-5, Declaration of Ann Cappetta In Support of Plaintiff's Motion for Preliminary Injunction ("Cappetta Dec."), Ex. 3 at 2.

In context, however, this letter concerns spectators' conduct—not their speech. It explains that existing laws penalizing reckless drivers cannot deter sideshows because sideshows "include" spectators. Doc. 15-5, Cappetta Dec., Ex. 3 at 2; *see also* ACC § 10.40.020 (defining a sideshow as reckless driving "for one or more spectator(s)"); Culley Dec., ¶¶ 15-16 ("Sideshows would not occur without spectators present to observe the reckless driving at close range."). The spectators cause their own problems: the letter lists drug and alcohol use, gun violence, vandalism, garbage, and injury and death. Doc. 15-5, Cappetta Dec., Ex. 3 at 3; ACC § 10.40.010. The letter also explains that spectators "encourag[e]" sideshows, including by gathering in large crowds and taking and posting videos on social media. Doc. 15-5, Cappetta Dec., Ex. 3 at 2. The latter statement, emphasized by Garcia, is merely one of several examples of how spectators may encourage sideshows. Nothing in the letter or the Ordinance itself mentions any restriction on posting videos or otherwise publicizing sideshows. As a whole, the letter shows that the Ordinance is intended to ensure spectators can "be held accountable"—*not* for posting videos to Tik-Tok, but for their participation in an activity that threatens public safety and quality of life in all of the ways the letter

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

discusses. *Id.* at 2-3; *cf. Raef*, 240 Cal. App. 4th at 1131-32 (looking at legislative history document as a whole to determine that the legislature had a content-neutral motivation).

In any event, "courts will not invalidate a statute that is 'constitutional on its face, on the basis of what fewer than a handful of [legislators] said about it.'" *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 116 (9th Cir. 2024) (quoting *O'Brien*, 391 U.S. at 384) (alteration in original). In fact, the Board did not fully adopt the views in the letter. The Ordinance's findings copy verbatim most of the factors described in the letter cited by Garcia. *Compare* Doc. 15-5, Cappetta Dec., Ex. 3 at 2-3, *with* ACC § 10.40.010. But those findings *omit* concerns about video and social media. *Id.* The Board's omission of this topic, combined with the absence of any evidence of speech-suppressive intent on the face of the Ordinance, suggests that the Board lacked intent to suppress speech about sideshows. *O'Brien*, 391 U.S. at 384 ("What motivates one legislator to make a speech about a statute is not necessarily what motivates . . . others to enact it . . . . We decline to void . . . legislation . . . which could be reenacted in its exact form if [a] . . . legislator made a 'wiser' speech about it.").

Finally, Garcia argues the Ordinance is content-based because it allegedly prohibits recording of sideshows but not recording of other subjects, like photography of a sunset or architectural details, in the same time and place. Mot. at 18-19. Garcia misconstrues the Ordinance's purpose and effect. The Ordinance does not prohibit recording sideshows. A passerby or a neighbor may record a nearby sideshow to show a friend, to inform police or the local news, or to post the video to social media. Meanwhile, a spectator knowingly present at the same time and place to observe the sideshow violates the Ordinance whether they film nothing, film the sideshow, or film the sunset while they are there. Recording—or any other speech activity—is superfluous to the Ordinance's application and enforcement.[9]

---

[9] Plaintiff's central case is thus inapposite. The statute in *ALDF*, 878 F.3d at 1184, expressly prohibited recording on a particular subject. The Ordinance here does not prohibit recording. *Brown v. Kemp*, 86 F.4th at 779-80, is also distinguishable. There, the law directly prohibited recording, and even the non-recording provisions clearly targeted the plaintiff's expressive activities. The Ordinance here does not target expressive activity.

1    Rather, the Ordinance distinguishes not based on the subject of an individual's

2    speech, but based on the intent behind an individuals' conduct—her knowing presence at a

3    sideshow for the purpose of observing it—because of unique dangers associated with that

4    intent. An individual who intends *knowingly to be a spectator* at a sideshow implicates

5    threats to public safety and quality of life in ways that an individual who intends to observe

6    a sunset in the same time and place does not. Culley Dec., ¶¶ 15-16. While both observers

7    are at risk of injury from reckless driving, one who travels to an intersection to watch a

8    sideshow is more likely to be associated with drug and alcohol use, gun violence, looting,

9    noise, and reckless driving of their own, and they are more likely to remain at the scene

10   despite these dangerous behaviors, than the romantic who arrives at the same place in

11   search of a sunset. *Id.* Further, a driver is more likely to "ghost ride the whip" for an audi-

12   ence watching his stunts than he is to drive recklessly for, say, an architectural critic focused

13   on documenting a particularly stunning example of Modernism.

14   At the same time, the reporter who seeks out a sideshow to watch and film it from

15   within the throng of spectators may be indistinguishable from other engaged audience mem-

16   bers, and thus may contribute to the same risks, even if the reporter's purpose in observing

17   and filming is to educate rather than to encourage. The Ordinance prohibits spectators' be-

18   havior, including the spectating behavior of members of the press, not because of any

19   relation to speech or its subject matter, but because of the dangers of spectating to public

20   safety and quality of life. These are both content-neutral concerns. *See Hill v. Colorado*, 530

21   U.S. 703, 719-20 (2000) ("[G]overnment regulation of expressive activity is 'content neutral'

22   if it is justified without reference to the content of regulated speech."); *see also City of Seattle*

23   *v. Abercrombie*, 85 Wash. App. 393, 399 (1997) (law penalizing refusing to leave a crime

24   scene after request by an officer was content-neutral because it was "directed at the conduct

25   of the individual" in refusing to leave, and "not the words being spoken").

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### b.   The Ordinance is narrowly tailored to serve a compelling governmental interest in public safety.

To pass intermediate scrutiny, a content-neutral time, place, and manner regulation must be narrowly tailored to serve a compelling government interest. *Cmty. for Creative Non-Violence*, 468 U.S. at 293. Unlike laws subject to strict scrutiny, such a regulation need not employ the least restrictive means of furthering the state's interests. *Ward*, 491 U.S. at 798-99. Rather, a law is narrowly tailored if it promotes an interest that "would be achieved less effectively absent the regulation." *Id.* at 799; *United States v. Albertini*, 472 U.S. 675, 688-89 (1985). Then, so long as the regulation does not "burden substantially more speech than is necessary to further the government's legitimate interest," it is narrowly tailored. *Ward*, 491 U.S. at 799-800. Courts focus this analysis on the law's effects as a whole, not its application to a particular individual. *Id.* at 801.

The Ordinance furthers compelling interests in public safety and quality of life by deterring spectating at sideshows. Spectators risk injury and death. Culley Dec., ¶ 7a-b. By their presence, they encourage sideshows and the lawless behaviors associated with them. *Id.*, ¶¶ 15-16. Spectators contribute to the public safety hazards associated with sideshows, including looting, destruction of public property, and diverting law enforcement from other priorities. *Id.*, ¶¶ 7d, 10, 11. Sideshows also generate noise, air pollution, garbage, and traffic disruptions, at all hours of the day and night. *Id.*, ¶¶ 8a-d. Many of these nuisances stem from spectators themselves. *Id.* By deterring spectating, the Ordinance deters these harms.

These interests are compelling, and Garcia does not say otherwise. In fact, the acute dangers posed by sideshows make the County's public safety concerns even more compelling than those upheld in other cases. *See, e.g., Menotti v. City of Seattle*, 409 F.3d 1113, 1143 n.57 (9th Cir. 2005) (city had compelling interest in safety and security); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 947-48 (9th Cir. 2011) (city had compelling interests in traffic safety and flow); *see also Ward*, 491 U.S. at 796 (city had substantial interest in protecting residents from unwelcome noise).

---

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

The Ordinance is narrowly tailored to advance public safety and quality of life because it hones in on the harmful behavior of spectating without restricting more speech than necessary. First, the Ordinance's "knowing presence" requirement avoids sweeping in innocent bystanders. Second, the 200-foot boundary allows individuals to view a sideshow from a safer distance, and from a position less likely to encourage sideshows and other illegal behaviors. Culley Dec., ¶ 16. Third, the Ordinance does not prohibit speaking or gathering information about sideshows—or any other topic—*from any location*, so long as the speaker is not knowingly within the 200-foot boundary for the purpose of spectating. Fourth, the Ordinance does not prohibit recording or reporting; it says nothing about video, photographs, or note-taking. Contrary to Garcia's claims, Mot. at 17-18, 22, individuals may record sideshows and share video with the media, the police, or their social media followers; none of that is a crime under the Ordinance. It prohibits being *knowingly* present for the purpose of spectating at the sideshow. Fifth, the Ordinance does not penalize the use of video or other information, even if obtained from a spectator. Ultimately, the County sought to avoid the harms created (or suffered) by sideshow spectators, and it determined that penalizing knowing spectating—i.e., being *present* for the purpose of viewing a sideshow, and not merely seeing a sideshow, let alone recording one—would reduce those harms. By prohibiting only spectating near a sideshow, the County chose means proportional to its ends.[10]

---

[10] Garcia argues that the Ordinance is *under*inclusive because it does not prohibit observing or recording by participants or via remote means (e.g., via drone). Mot. at 22. Garcia mistakes the Ordinance's goals. It does not prohibit recording and prohibits only being *knowingly* present to observe—conduct in which even drivers arguably engage. Further, recording sideshows by remote means is not associated with the same unlawful behaviors as spectating at close range. Culley Dec., ¶ 16. That the Ordinance allows remote recording and does not restrict the use of recordings, however they were made, is a feature and not a flaw. Similar considerations refute Garcia's argument that the Ordinance is *over*inclusive because it covers conduct—e.g., protesting sideshows or reporting on them—unrelated to promoting sideshows. *See* Mot. at 22. Like sideshow fans, protestors and reporters knowingly attending a sideshow are more likely than passersby to stay at a sideshow despite the dangerous conditions, Culley Dec., ¶¶ 15-16, raising their risk of injury. *Cf. Raef*, 240 Cal. App. 4th at 1135 (one driving recklessly to take photographs is more likely to continue tailgating than other drivers). The Ordinance is narrowly tailored to combat these safety risks.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

Garcia may argue that the County had alternative available means to suppress side-shows and related harms, including enforcing existing laws, penalizing facilitating sideshows, *see* Mot. at 20, or implementing infrastructure solutions, Doc. 15-3, Garcia Dec., Ex. 2 at 15. There are several flaws in this argument.

First, the proposed alternatives have not successfully deterred sideshows. Garcia himself has reported that enforcement of alternative ordinances has not succeeded in the City of Oakland, Doc. 15-3, Garcia Dec., Ex. 2 at 2, 14, and that infrastructure interventions have not deterred sideshows, Stanton Dec., Ex. B at 5. The Sheriff's Office reached the same conclusions. Culley Dec., ¶¶ 13, 14. Garcia cites articles about enforcement in San Diego to argue that enforcement, without penalizing spectators, works. Mot. at 20-21. San Diego, however, adopted an ordinance that prohibited spectating at sideshows approximately 20 years ago. *See* San Diego Municipal Code § 52.5203; *Foley*, 117 Cal. App. 4th at 211 (finding ordinance valid under state law); Stanton Dec., Ex. C at 9 (article cited by Garcia; "11 people were arrested on suspicion of crimes including . . . spectating at an illegal event."). Garcia's articles support the County's argument and undermine his own.

Second, as described above, the government need not choose the *least* restrictive al-ternative, so long as it does not burden more speech than needed to achieve its goals. The Ordinance aims to deter evils associated with audiences for sideshows; it does so by penal-izing joining such an audience. The Court should not second-guess the County's reasonable determination that the Ordinance's penalties would protect public safety from threats re-lated to the penalized behavior. *Ward*, 491 U.S. at 800-01 (requiring courts to "defer to the [government's] reasonable determination that its interest . . . would be best served by" its choice of measure); *Raef*, 240 Cal. App. 4th at 1135-36 (concluding that considering other alternatives "would constitute impermissible second-guessing of the Legislature").

### c.     The Ordinance leaves open ample alternative channels for communicating information.

The Ordinance minimally affects speech. For example, Garcia may venture inside a 200-foot radius of a sideshow to interview residents, passersby, spectators, or even drivers,

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

and to record these interviews. He may film a sideshow he happens upon while present for other purposes. From beyond the 200-foot radius, he may obtain video or photographs, including via a remotely operated camera installed at the scene of frequent sideshows prior to an event, a drone, or a telephoto lens. *See Nicodemus v. City of South Bend*, No. 3:23-cv-744 DRL, 2024 WL 139248 (N.D. Ind. Jan. 12, 2024), *appeal filed*, No. 24-1099, at \*1, 7 (7th Cir. Jan. 23, 2024) (citing advanced recording technology to conclude that a buffer around police officers will not impair citizens' ability to record).[11] He can use and publish sideshow video obtained from any source, including from bystanders, law enforcement, spectators, or even sideshow drivers—the Ordinance says nothing about images or recordings. *See* Erwin Chemerinsky, *Balancing the Rights of Privacy and the Press: A Reply to Professor Smolla*, 67 Geo. Wash. L. Rev. 1152, 1155 (1999) (anti-paparazzi law discussed in *Raef* had minimal First Amendment impact, in part because it did not limit publication of images, even those obtained during unlawful reckless driving). He may film the subsequent law enforcement response from any distance. He may record the aftermath of sideshows—Garcia's reporting has used such images to great effect. Doc. 15-2, Garcia Dec., Ex. 1 at 2, 5; Doc. 15-3, Garcia Dec., Ex. 2 at 4, 7-11, 13, 15. And he may continue to rely on public data and post-incident interviews. *See* Doc. 15-1, Garcia Dec. at ¶¶ 13, 16.

The only thing Garcia may not do is knowingly join a sideshow by being within 200 feet of it for the purpose of observing it—the exact behavior associated with enhanced risks to public safety and quality of life. In short, Garcia may continue to educate the public about the dangers of sideshows. But he has no First Amendment right to contribute to those dangers. *See Branzburg*, 408 U.S. at 684-85 ("[T]he First Amendment does not guarantee the

---

[11] The buffer zone in *Nicodemus* was 25 feet, a distance deemed appropriate to allow officers to react to pedestrians. 2024 WL 139248, at \*5. In contrast, the Ordinance concerns dangers presented by reckless driving. A car traveling at 30 mph covers 200 feet in less than 5 seconds; a car traveling at 70 mph covers 200 feet in less than 2 seconds. This justifies a greater buffer for sideshows. But even under *strict* scrutiny, the Supreme Court does not require the state to empirically justify the limits of a buffer zone and instead defers to the state's judgments. *Burson v. Freeman*, 504 U.S. 191, 208-09 (1992) (declining to second-guess state's choice of a 100-foot electioneering buffer around polling places).

press a constitutional right of special access to information not available to the public generally."); *see also Bergen*, 883 P.2d at 545 ("The dogfighting statute does not prohibit a news reporter from gathering or disseminating information about dogfighting. It simply prohibits attendance, by anyone, at any dogfight that is presented for profit or entertainment.").

> ### 2. The Ordinance is a valid regulation of the non-expressive aspect of conduct with expressive and non-expressive elements under *United States v. O'Brien.*

The Ordinance is not subject to First Amendment scrutiny because it regulates non-expressive conduct: intentionally joining a sideshow as an audience member. *See* § I.A, *supra*. But even if one were to view the Ordinance as regulating conduct with both non-expressive and expressive elements, it would be valid under the intermediate scrutiny applied to such regulation by the Supreme Court in *United States v. O'Brien*, which upheld a regulation prohibiting destruction of draft cards.

As described above, joining a sideshow as a spectator constitutes conduct, not speech. *Colten*, 407 U.S. at 109 (plaintiff's observation of traffic citation from highway "was not, without more, protected by the First Amendment"). Assuming *arguendo* that the conduct asserted by Garcia—joining a sideshow to record and report on it—involves expressive conduct, it does so as part of a course of conduct involving non-speech (spectating) and speech (recording and reporting) elements. Just as public nudity may be expressive in some activities and not others—e.g., when combined with erotic dancing, but not when topless sunbathing, *see Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 571 (1991)—observing sideshows may be no more expressive than watching a sporting match, *James v. City of Long Beach*, 18 F. Supp. 2d 1078, 1083 (C.D. Cal. 1998) (sports fans are not engaged in expressive conduct). Because the Ordinance targets the non-speech elements of sideshow-spectators' conduct for public safety and quality of life purposes unrelated to the suppression of speech, and because it restricts no more speech than necessary to further its goals, it withstands intermediate scrutiny under *O'Brien*. *See Project Veritas*, 418 F. Supp. 3d at 256, 258 (law prohibiting undercover reporting of political campaigns was valid under *O'Brien* because it targeted non-expressive conduct—infiltration of campaigns—to further interests in

promoting election integrity unrelated to suppressing speech); *see also Raef*, 240 Cal. App.
4th at 1133-36 (law penalizing reckless driving to obtain images for commercial purposes
was valid under *O'Brien* when it targeted behavior because of its unique dangers to public
safety and not to suppress images).

Regulation of conduct with both non-expressive and expressive elements must be up-
held

> [1] if it is within the constitutional power of the Government; [2] if it furthers
> an important or substantial government interest; [3] if the governmental in-
> terest is unrelated to the suppression of free expression; and [4] if the
> incidental restriction on . . . [expression] is no greater than is essential to the
> furtherance of that interest.

*O'Brien,* 391 U.S. at 377. The Ordinance satisfies this test.

First, Garcia does not assert that the Ordinance exceeds "the constitutional power of
the Government," only that it allegedly infringes on expression. The Ordinance plainly lies
within the County's constitutional power. Second, the Ordinance furthers compelling inter-
ests in public safety and quality of life. *See* § I.B.1.b, *supra*. Third, those interests do not
relate to the suppression of speech. The Ordinance says nothing about recording, reporting,
or speech of any kind on its face; nor is it justified by the suppression of speech, let alone
speech on any particular subject or viewpoint. *See* § I.B.1.a, *supra*; *see also Project Veritas*,
418 F. Supp. 3d at 259 (recognizing that this element of *O'Brien* is satisfied if the law is
content-neutral). Finally, the ordinance restricts no more expression than necessary to
achieve its interests: it is narrowly tailored. *See* § I.B.1.b, *supra*; *see also Ward*, 491 U.S. at
798 (the analysis under *O'Brien* is effectively the same as the narrow tailoring analysis
applied to time, place, or manner restrictions).

## II.   Garcia has not shown that he would be irreparably harmed by the Ordinance absent a preliminary injunction.

Because Garcia has failed to establish a likelihood of success on the merits of his
constitutional claim, he has not demonstrated a First Amendment injury. Without such an
injury, he cannot show irreparable harm absent an injunction or that the balance of the

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

equities tips in his favor. *Thalheimer v. City of San Diego*, No. 09-cv-2862 IEG, 2010 WL 3489335, at *6 (S.D. Cal. Sep. 3, 2010).

Moreover, even if Garcia could establish a likelihood of success on the merits, he still cannot show that an injunction is needed to address a threat of *imminent* irreparable harm. *See Boardman*, 822 F.3d at 1022. There have been no sideshows in the unincorporated County in the 13 months the Ordinance has been in effect.[12] Culley Dec., ¶ 19. The County has never enforced the Ordinance. *Id.*, ¶ 20. For his part, Garcia does not state that he has *ever* attended a sideshow, and in fact, his reporting has been based entirely on data and content provided by others. *See* Factual Background § D, *supra*. Nor does he show that he has knowledge of when and where sideshows will occur.

In short, Garcia's alleged injury requires each event in the following sequence to occur: (1) a sideshow in the unincorporated County, (2) happening with Garcia's knowledge, (3) that he attends, (4) to which law enforcement responds, (5) resulting in arrests or citation of spectators. This long chain of events does not amount to an imminent threat of harm; it amounts to speculation on speculation. *Index Newspapers, LLC v. City of Portland*, No. 3:20-cv-1035-SI, 2022 WL 72124, at *9 (D. Or. Jan. 7, 2022) (facts no longer supported irreparable harm where events causing potential injury had not recently occurred). Nor does Garcia's alleged self-censorship suffice: chilling of First Amendment rights cannot yield irreparable injury when it stems from a fear of injury based on speculation.[13] *Id.*

---

[12] Garcia's year-long delay in filing suit after the County enacted the Ordinance also indicates there is no imminent need for injunctive relief. *See, e.g., Spiraledge, Inc. v. SeaWorld Ent., Inc.*, No. 13CV296-WQH-BLM, 2013 WL 3467435, at *5 (S.D. Cal. July 9, 2013) (13 month delay in filing lawsuit "supports the conclusion that [the plaintiff] has failed to demonstrate that irreparable injury is likely") (citing *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985)).

[13] The manifold speculations necessary to find harm here also suggest that Garcia lacks Article III standing to bring the action. In "pre-enforcement cases," such as this, plaintiffs must establish a "specific" and "credible threat" that the defendant will enforce the law against them. *Lopez v. Candaele*, 630 F.3d 775, 785, 788 (9th Cir. 2010). The County may challenge Garcia's standing in subsequent dispositive motion practice.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS

1    Finally, Garcia's allegations of harm are entitled to little weight. The Ordinance

2  leaves open ample alternative channels for Garcia to report on sideshows, including both all

3  of the channels his reporting has relied on before and the many avenues of direct newsgath-

4  ering at sideshows and from 200 feet away that do not violate the Ordinance.[14] *See* § I.B.1.c,

5  *supra*; *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182 (E.D. Cal. 2015) (affording

6  "minimal weight" to First Amendment harms where alternative modes of communication

7  remained open).

8                                    **CONCLUSION**

9    For the reasons stated above, Defendants request that the Court deny the motion for

10 preliminary injunction.

11

12 DATED:  August 29, 2024              SHUTE, MIHALY & WEINBERGER LLP

13

14                                     By:      /s/Aaron M. Stanton

15                                            MATTHEW D. ZINN
                                              AARON M. STANTON
16

17                                            Attorneys for Defendants
                                              County of Alameda and Yesenia Sanchez

18

19

20

21

22

23

24

25

26

---

[14] Even if Garcia were to wait for a sideshow to occur at the specific intersection he identifies
27 on the border of the unincorporated County, Dec. 15-1, Garcia Dec., ¶¶ 15, 22, he could be
knowingly present there to observe the sideshow at close range from the Oakland side of
28 the intersection without violating the Ordinance.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:24-cv-3997-RS