DAVID LOY, Cal. Bar No. 229235
ANN CAPPETTA, Cal. Bar No. 354079
FIRST AMENDMENT COALITION
534 4th Street, Suite B
San Rafael, CA 94901-3334
Telephone:   415.460.5060
Email:       dloy@firstamendmentcoalition.org
             acappetta@firstamendmentcoalition.org

Attorneys for Plaintiff JOSE ANTONIO GARCIA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| JOSE ANTONIO GARCIA,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>COUNTY OF ALAMEDA, and YESENIA SANCHEZ, Sheriff of Alameda County, in her official capacity,<br><br>　　　　　Defendants. | Case No. 3:24-cv-03997-RS<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:　October 3, 2024<br>Time:　1:30 p.m.<br>Judge: Honorable Richard Seeborg<br>Ctrm:　Courtroom 3 – 17th Floor |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................1

II. ARGUMENT ......................................................................................................1

A.  The Ordinance Is Subject to First Amendment Scrutiny Because It Restricts Access to a Traditional Public Forum and Inherently Prohibits Recording Events in that Forum. ..........................................................................................1

  1.  The Ordinance Limits Access to a Traditional Public Forum. .......................1

  2.  The Ordinance Inherently Prohibits Speech in a Public Forum. ....................2

  3.  The County Misreads the Ordinance and Ignores Binding Precedent. ..........4

B.  The Ordinance is Content Based Because Its Plain Language Inherently Prohibits Recording or Reporting on Sideshows but not Other Topics at the Same Time and Place. ........................................................................................7

C.  The Ordinance Fails Either Strict or Intermediate Scrutiny. .....................................8

  1.  The Ordinance Does Not Meet Strict Scrutiny Because the County Retains Less Restrictive Alternatives to Serve Its Interest in Preventing Unlawful Conduct. ........................................................................8

  2.  The Ordinance Fails Intermediate Scrutiny Because There Are Abundant Obvious Means to Prevent the Unlawful Conduct Involved in Sideshows Without Restricting Protected Speech. ...................10

D.  Fermoso Has Standing and Is Suffering Irreparable Harm Because the Ordinance is Chilling His First Amendment Right to Observe and Record Events in a Traditional Public Forum. .................................................................12

III. CONCLUSION .................................................................................................15

1

# <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

<u>Cases</u>

4

*ACLU of Ill. v. Alvarez*
    679 F.3d 583 (7th Cir. 2012) ........................................................................... 3

5

6

*Anderson v. City of Hermosa Beach*
    621 F.3d 1051 (9th Cir. 2010) ............................................................... 3, 9, 12

7

*Animal Legal Def. Fund v. Wasden*
    878 F.3d 1184 (9th Cir. 2018) ..................................................................... 3, 7

8

9

*Aptive Env't, LLC v. Town of Castle Rock*
    959 F.3d 961 (10th Cir. 2020) ....................................................................... 12

10

*Arcara v. Cloud Books, Inc.*
    478 U.S. 697 (1986) ..................................................................................... 6, 7

11

12

*Ariz. Right to Life Pol. Action Comm. v. Bayless*
    320 F.3d 1002 (9th Cir. 2003) ....................................................................... 14

13

14

*Askins v. U.S. Dep't of Homeland Sec.*
    899 F.3d 1035 (9th Cir. 2018) ......................................................................... 4

15

*Berger v. City of Seattle*
    569 F.3d 1029 (9th Cir. 2009) (en banc) .................................................. 2, 11

16

17

*Bland v. Fessler*
    88 F.3d 729 (9th Cir. 1996) ..................................................................... 12, 14

18

19

*Boardman v. Pac. Seafood Grp.*
    822 F.3d 1011 (9th Cir. 2016) ....................................................................... 15

20

*Brown v. Kemp*
    86 F.4th 745 (7th Cir. 2023) ..................................................................... 3, 4, 5

21

22

*Burson v. Freeman*
    504 U.S. 191 (1992) ................................................................................... 9, 10

23

24

*Cal. Pro-Life Council, Inc. v. Getman*
    328 F.3d 1098 (9th Cir. 2003) .............................................................. 12, 14, 15

25

*Chestnut v. Wallace*
    947 F.3d 1085 (8th Cir. 2020) ......................................................................... 3

26

27

*City of Cincinnati v. Discovery Network, Inc.*
    507 U.S. 410 (1993) ....................................................................................... 11

28

*City of Seattle v. Abercrombie*
    85 Wash. App. 393 (1997) ........................................................................... 7

*Clark v. Cmty. for Creative Non-Violence*
    468 U.S. 288 (1984) ................................................................................... 10

*Colten v. Kentucky*
    407 U.S. 104 (1972) ................................................................................ 6, 7

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*
    657 F.3d 936 (9th Cir. 2011) (en banc) ................................................. 4, 11

*Cuviello v. City of Vallejo*
    944 F.3d 816 (9th Cir. 2019) .................................................................... 15

*Doe v. City of Lafayette*
    377 F.3d 757 (7th Cir. 2004) ..................................................................... 6

*Doe v. Horne*
    No. 23-16026, 2024 U.S. App. LEXIS 22847 (9th Cir. Sept. 9, 2024) .................. 15

*Dombrowski v. Pfister*
    380 U.S. 479 (1965) ................................................................................... 12

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*
    82 F.4th 664 (9th Cir. 2023) (en banc) ...................................................... 15

*Flanagan v. Flanagan*
    27 Cal. 4th 766 (2002) ............................................................................... 4

*Foley v. Superior Court*
    117 Cal. App. 4th 206 (2004) ..................................................................... 2

*Frisby v. Schultz*
    487 U.S. 474 (1988) ................................................................................... 11

*Grossman v. City of Portland*
    33 F.3d 1200 (9th Cir. 1994) ..................................................................... 10

*Hernández-Gotay v. United States*
    985 F.3d 71 (1st Cir. 2021) ......................................................................... 2

*Hill v. Colorado*
    530 U.S. 703 (2000) ..................................................................................... 7

*Holder v. Humanitarian L. Project*
    561 U.S. 1 (2010) ...................................................................................... 14

*Hoye v. City of Oakland*
    653 F.3d 835 (9th Cir. 2011) ....................................................................... 8

*IMDb.com Inc. v. Becerra*
    962 F.3d 1111 (9th Cir. 2020) ................................................................. 9

*Index Newspapers LLC v. U.S. Marshals Serv.*
    977 F.3d 817 (9th Cir. 2020) ............................................................... 5, 8

*Italian Colors Rest. v. Becerra*
    878 F.3d 1165 (9th Cir. 2018) ........................................................... 13, 14

*James v. City of Long Beach*
    18 F. Supp. 2d 1078 (C.D. Cal. 1998) ...................................................... 5

*Jordan v. Adams Cnty. Sheriff's Office*
    73 F.4th 1162 (10th Cir. 2023) ............................................................... 4

*In re K.M.*
    75 Cal. App. 5th 323 (2022) .................................................................. 9

*Lair v. Bullock*
    697 F.3d 1200 (9th Cir. 2012) ............................................................... 10

*Leigh v. Salazar*
    677 F.3d 892 (9th Cir. 2012) .................................................................. 3

*Libertarian Party of L.A. Cnty. v. Bowen*
    709 F.3d 867 (9th Cir. 2013) ................................................................. 13

*Long Beach Area Peace Network v. City of Long Beach*
    574 F.3d 1011 (9th Cir. 2009) ............................................................... 10

*Lopez v. Candaele*
    630 F.3d 775 (9th Cir. 2010) ................................................................. 13

*LSO, Ltd. v. Stroh*
    205 F.3d 1146 (9th Cir. 2000) ............................................................... 13

*Majors v. Abell*
    317 F.3d 719 (7th Cir. 2003) ................................................................. 14

*McCullen v. Coakley*
    573 U.S. 464 (2014) ......................................................... 2, 5, 7, 10, 11

*Meinecke v. City of Seattle*
    99 F.4th 514 (9th Cir. 2024) .............................................................. 9, 15

*NAACP v. Button*
    371 U.S. 415 (1963) ............................................................................ 4

*National Press Photographers Ass'n v. McCraw*
    90 F.4th 770 (5th Cir. 2024) .................................................................. 2

*Nunez ex rel. Nunez v. City of San Diego*
    114 F.3d 935 (9th Cir. 1997) ............................................................................... 3

*Oakland Trib., Inc. v. Chronicle Publ'g Co.*
    762 F.2d 1374 (9th Cir. 1985) ............................................................................. 15

*Peace Ranch, LLC v. Bonta*
    93 F.4th 482 (9th Cir. 2024) ........................................................................... 13, 14

*People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*
    60 F.4th 815 (4th Cir. 2023) ................................................................................. 3

*People v. Bergen*
    883 P.2d 532 (Colo. App. 1994) ........................................................................... 2

*People v. Lara*
    9 Cal. App. 5th 296 (2017) .................................................................................... 9

*People v. Ng*
    13 Cal. 5th 448 (2022) .......................................................................................... 4

*Project Veritas v. Ohio Election Comm'n*
    418 F. Supp. 3d 232 (S.D. Ohio 2019) ................................................................ 8

*Republican Party v. White*
    536 U.S. 765 (2002) .............................................................................................. 8

*Sanchez v. City of Atherton*
    No. 22-cv-03106, 2023 U.S. Dist. LEXIS 3763 (N.D. Cal. 2023) ....................... 3

*Schneider v. New Jersey*
    308 U.S. 147 (1939) ............................................................................................ 13

*Snyder v. Phelps*
    562 U.S. 443 (2011) .............................................................................................. 2

*Spiraledge, Inc. v. Seaworld Ent., Inc.*
    No. 13cv296, 2013 U.S. Dist. LEXIS 96616 (S.D. Cal. July 9, 2013) ............... 15

*Susan B. Anthony List v. Driehaus*
    573 U.S. 149 (2014) ....................................................................................... 13, 14

*Tingley v. Ferguson*
    47 F.4th 1055 (9th Cir. 2022) ......................................................................... 12, 14

*Turner Broad. Sys., Inc. v. FCC*
    512 U.S. 622 (1994) ............................................................................................ 10

*United States v. Grace*
    461 U.S. 171 (1983) ............................................................................................ 10

*United States v. O'Brien*
    391 U.S. 367 (1968) .......................................................................................... 10

*United States v. Swisher*
    811 F.3d 299 (9th Cir. 2016) ............................................................................ 10

*Virginia v. Am. Booksellers Ass'n*
    484 U.S. 383 (1988) .......................................................................................... 12

*W. Watersheds Project v. Michael*
    869 F.3d 1189 (10th Cir. 2017) ......................................................................... 4

*Ward v. Rock Against Racism*
    491 U.S. 781 (1989) .......................................................................................... 11

*Wright v. City of St. Petersburg*
    833 F.3d 1291 (11th Cir. 2016) ......................................................................... 6

<u>Statutes</u>

7 U.S.C. § 2156(a)(2)(A) .............................................................................................. 2

Alameda County, Cal., Code § 10.40.020 (2024) ............................................. 1, 4, 6, 7, 8

Alameda County, Cal., Code § 10.40.030 (2024) ....................................................... 1

Oakland, Cal., Code §§ 10.74.010–10.74.090 (2023) ................................................ 9

<u>Other Authorities</u>

U.S. Const. amend. I .......................................................................................... passim

# I.      INTRODUCTION

No one disputes that sideshows can present hazards, but that is not the issue. The issue is whether the First Amendment prevents the County from criminalizing journalism by restricting access to a public forum for the purpose of observing a sideshow. Under Supreme Court law that the County cannot distinguish, the Ordinance is subject to First Amendment scrutiny because it restricts access to a traditional public forum. It also inherently restricts speech by limiting the right to observe events in a public forum, which is a necessary predicate to recording or reporting on them. The County cannot avoid the First Amendment by equating all observers of sideshows with participants in unlawful conduct, nor can it punish peaceful observers for the unlawful conduct of others. The Ordinance is content based because it inherently prohibits recording or reporting on sideshows but not other topics at the same time and place. It is unlikely to survive strict scrutiny. Any concern for bystanders' safety is not tenable because the Ordinance does not prohibit all persons from being present near sideshows. The County's interest reduces to preventing the unlawful conduct of some persons, which can be served by enforcing existing laws or adopting an ordinance similar to those adopted or proposed in Oakland and San Francisco that target promoting or aiding and abetting sideshows without infringing the First Amendment rights of the press or public. Even if the Ordinance were content neutral, it would likely fail intermediate scrutiny due to the abundance of obvious alternatives for addressing sideshows without restricting speech. Because his speech is chilled by the Ordinance, Fermoso has standing and is suffering irreparable harm. The Court is therefore respectfully requested to enter a preliminary injunction.

# II.     ARGUMENT

## A.      The Ordinance Is Subject to First Amendment Scrutiny Because It Restricts Access to a Traditional Public Forum and Inherently Prohibits Recording Events in that Forum.

### 1.      The Ordinance Limits Access to a Traditional Public Forum.

Sideshows occur "on a public street or highway." Alameda County, Cal., Code ("ACC") § 10.40.030 (2024). By prohibiting persons from being "within two hundred (200) feet of the location of the sideshow event, or within two hundred (200) feet of the site of the preparations for any sideshow event" for purposes of observing the event, ACC § 10.40.020, the Ordinance

restricts access to public streets and sidewalks. Public streets and sidewalks are "the archetype of a traditional public forum" and hold a "special position in terms of First Amendment protection." *Snyder v. Phelps*, 562 U.S. 443, 456 (2011).

The Supreme Court held a law that "restricts access to traditional public fora" is "subject to First Amendment scrutiny" even if it "says nothing about speech on its face." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014). This case is about a traditional public forum, not "places normally closed to the public, such as prisons." Defs.' Opp'n to Mot. Prelim. Inj. at 17:17–18. The "protections afforded by the First Amendment" are "nowhere stronger" than in "traditional public fora." *Berger v. City of Seattle*, 569 F.3d 1029, 1035–36 (9th Cir. 2009) (en banc).

The County cites no case to the contrary and wrongly relies on cases that do not involve traditional public forums. In *National Press Photographers Ass'n v. McCraw*, 90 F.4th 770 (5th Cir. 2024), the court addressed a law that restricted drone flights over private property or nonpublic forums such as "airports, petroleum refineries, power generators, and military installations," as well as "correctional facilities and detention centers" and "large sports venues." *Id.* at 778. The court rejected a claim of "access to information not available to the public generally" and did not address access to a traditional public forum. *Id.* at 792. Likewise, cases about "animal fights" or "illegal boxing matches," Opp'n at 17:24, are irrelevant because they addressed prohibitions on attending nonpublic events, not restrictions on access to a traditional public forum.[1] *See, e.g.*, *People v. Bergen*, 883 P.2d 532, 544 (Colo. App. 1994) (rejecting claim of "access to information that is not generally available to the public").

### 2.    The Ordinance Inherently Prohibits Speech in a Public Forum.

The Ordinance is also subject to First Amendment review because it inherently restricts speech in a traditional public forum. The acts of making a recording, taking notes, or otherwise

---

[1] The law at issue in *Hernández-Gotay v. United States*, 985 F.3d 71 (1st Cir. 2021), banned "'sponsor[ship]' and 'exhibit[ion]' of cockfighting matches." *Id.* at 75 (alteration in original). The court did not address the law against attending such matches, 7 U.S.C. § 2156(a)(2)(A), and this Court need not consider such laws, because they do not restrict access to a traditional public forum. *Foley v. Superior Court*, 117 Cal. App. 4th 206 (2004), held only that a sideshow ordinance was not preempted by state law; it did not consider any First Amendment issues.

1  reporting on events in a public forum are pure speech protected by the First Amendment.

2  *See Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203–04 (9th Cir. 2018); *Leigh v. Salazar*,

3  677 F.3d 892, 897 (9th Cir. 2012); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595–96 (7th Cir. 2012).

4  It is impossible to record or report on events in a public forum without observing them. *Chestnut*

5  *v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020); *Sanchez v. City of Atherton*, No. 22-cv-03106,

6  2023 U.S. Dist. LEXIS 3763, at *14 (N.D. Cal. 2023). The First Amendment protects both "the

7  process of creating a form of *pure* speech" and "the product of these processes," and the predicate

8  act of observing events in a public forum is "inextricably intertwined with the purely expressive

9  product" of a recording or story depicting them. *Anderson v. City of Hermosa Beach*, 621 F.3d

10  1051, 1061–62 (9th Cir. 2010); *see also People for the Ethical Treatment of Animals, Inc. v. N.C.*

11  *Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 829 (4th Cir. 2023) (First Amendment "safeguard[s] the

12  right to gather information as a predicate to speech.").

13      By restricting access to a traditional public forum for the purpose of observing events

14  therein, the Ordinance criminalizes an inherent part of creating pure speech about those events.

15  The Ordinance thus "prohibits conduct that is a necessary precursor" to speech and has "an

16  integral effect on the ability" of journalists and others "to express themselves" by recording or

17  reporting on events in a public forum. *Nunez ex rel. Nunez v. City of San Diego*, 114 F.3d 935,

18  950–51 (9th Cir. 1997). In other words, it targets activity that is intrinsic "to the creation of

19  speech." Opp'n at 15 n.6. The Ordinance is therefore subject to First Amendment scrutiny because

20  it "is directed narrowly and specifically at expression or conduct commonly associated with

21  expression" in a public forum. *Nunez*, 114 F.3d at 951 (citation omitted); *see also Brown v. Kemp*,

22  86 F.4th 745, 779 (7th Cir. 2023) (holding First Amendment protects actions essential to

23  "monitoring and recording" of public events, such as observing them from sufficient "visual or

24  physical proximity"). The legislative history on "video recordings," Cappetta Decl. ¶ 2 & Ex. 3,

25  confirms the obvious—by restricting presence in a public forum with intent to observe events

26  therein, the Ordinance's text inherently restricts recording those events.

27      The First Amendment right to observe and record events in a public forum is not limited to

28  "observing and recording police activity." Opp'n at 15:3 (emphasis omitted). "The First

1   Amendment protects the right to photograph and record matters of public interest" in a public

2   forum, including but not limited to "the right to record law enforcement officers." *Askins v. U.S.*

3   *Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018) (citations omitted); *see also, e.g.,*

4   *Brown*, 86 F.4th at 779; *W. Watersheds Project v. Michael*, 869 F.3d 1189, 1196 (10th Cir. 2017).

5          For First Amendment purposes, there is no principled distinction between a law that

6   prevents recording police activity in a public forum and a law that prevents recording other events

7   in the same forum. Under the County's rationale, the government could prevent all recording of

8   any events in a public forum—for example, police activity, protests, or performances—through

9   the mere subterfuge of omitting the word "recording" while prohibiting presence in the forum with

10  intent to observe such events. That result would make a mockery of the First Amendment.

11  *See Jordan v. Adams Cnty. Sheriff's Office*, 73 F.4th 1162, 1170 (10th Cir. 2023) ("If police

12  could stop criticism or filming by asking onlookers to leave, then this would allow the government

13  to simply proceed upstream and dam the source of speech" and thus "bypass the Constitution.")

14  (citations, quotation marks, and brackets omitted).

15          **3.      The County Misreads the Ordinance and Ignores Binding Precedent.**

16          The County cannot avoid the First Amendment by repeatedly labeling all reporters or

17  observers as "participants" or persons "joining a sideshow." Opp'n at 13:24–25, 29:13; *see also,*

18  *e.g.*, *id.* at 17:2–3, 28:18, 29:8. As an initial matter, the County's contention founders on the text

19  of the Ordinance, which states that "'spectator' includes" but is not limited to "any person at the

20  location of the sideshow event that may have participated in preparations and/or promoting the

21  sideshow event." ACC § 10.40.020. The term "spectator" is not limited to "participants," because

22  "includes" is a term of enlargement rather than limitation. *See People v. Ng*, 13 Cal. 5th 448, 540

23  (2022); *Flanagan v. Flanagan*, 27 Cal. 4th 766, 774 (2002). Even if the County's position were an

24  "authoritative construction[]" of the Ordinance, it could not prevent First Amendment scrutiny,

25  because it is "precluded by the plain language of the ordinance." *Comite de Jornaleros de*

26  *Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 946 (9th Cir. 2011) (en banc).

27          In any event, the government "cannot foreclose the exercise of constitutional rights by

28  mere labels." *NAACP v. Button*, 371 U.S. 415, 429 (1963). Unlike "commerce or conduct" such as

1  building "outdoor fires," renting property, selling firearms, "serving alcohol without a liquor

2  license," or "reckless driving," Opp'n at 14:9–21, 17:13, the mere act of observing events in a

3  public forum is protected by the First Amendment as a necessary predicate to recording or

4  reporting on them. *Brown*, 86 F.4th at 779. This case does not call into question "generally

5  applicable statutes" prohibiting "unlawful activity" that is unprotected by the First Amendment,

6  such as trespassing, "speeding [or] reckless driving." Opp'n at 17:1–9. Instead, this case is about a

7  restriction on access to a traditional public forum that inherently prohibits the recording of events

8  in that forum and thus targets pure speech.[2]

9      The fact that such events may involve unlawful conduct by some persons does not justify

10  infringing the First Amendment rights of other persons. The Ninth Circuit is clear that

11  "journalists" and "members of the public" who are peacefully observing or reporting on events in

12  a public forum "cannot be punished for the violent acts of others," and the "proper response to

13  potential and actual violence is for the government to ensure an adequate police presence . . . and

14  to arrest those who actually engage in such conduct, rather than to suppress legitimate First

15  Amendment conduct as a prophylactic measure." *Index Newspapers LLC v. U.S. Marshals Serv.*,

16  977 F.3d 817, 834 (9th Cir. 2020) (alteration in original) (citation and quotation marks omitted).

17      In holding that violence by some did not justify infringing the First Amendment rights of

18  others to observe a protest, *Index Newspapers* foreclosed the County's attempt to legislate away

19  the First Amendment rights of observers and reporters by contending a sideshow necessarily

20  requires an audience. The same could be said of a violent protest, yet the First Amendment would

21  clearly prohibit a law that punishes people for merely observing and thus recording the protest.

22      The County's response is incoherent. On one hand, it contends that a "passerby or a

23  neighbor may record a nearby sideshow" and Fermoso "may film a sideshow he happens upon

24  while present for other purposes." Opp'n at 23:19, 28:1–2. On the other hand, it asserts that "a

25  spectator knowingly present at the same time and place to observe the sideshow violates the

27  ───────────────

28  [2] Stadiums are not necessarily "public forums," *James v. City of Long Beach*, 18 F. Supp. 2d 1078, 1082 (C.D. Cal. 1998), but even if they are, *James* conflicts with the rule that restrictions on access to a public forum are subject to First Amendment scrutiny. *McCullen*, 573 U.S. at 476.

1    Ordinance." *Id.* at 23:20–21. The County cannot have it both ways. At the moment one begins

2    recording a sideshow within 200 feet of it, one becomes a "spectator" who is violating the

3    Ordinance by being knowingly "present at a sideshow event, . . . for the purpose of viewing,

4    observing, watching, or witnessing" it, ACC § 10.40.020, because it is impossible to record an

5    event without intending to view, observe, watch, or witness it. Therefore, the Ordinance inherently

6    "prohibit[s] recording sideshows." Opp'n at 23:18.

7    　　　　The County wrongly relies on irrelevant cases predicated on the speaker's commission of

8    unlawful conduct not protected by the First Amendment. In *Arcara v. Cloud Books, Inc.*, 478 U.S.

9    697 (1986), the Court discussed an investigation into "illicit sexual activities" at a bookstore,

10   which revealed "instances of masturbation, fondling, and fellatio" as well as "solicitation of

11   prostitution," all known to the management. *Id.* at 698–99. The government sought "closure of the

12   premises" under a law defining "places of prostitution, lewdness, and assignation as public health

13   nuisances." *Id.* at 699. The First Amendment did not apply because "the sexual activity carried on

14   in this case manifests absolutely no element of protected expression" and the "legislation

15   providing the closure sanction was directed at unlawful conduct having nothing to do with books

16   or other expressive activity."[3] *Id.* at 705, 707.

17   　　　　Likewise, *Colten v. Kentucky*, 407 U.S. 104 (1972), did not involve protected speech.

18   The defendant committed disorderly conduct that required "intent to cause public inconvenience,

19   annoyance or alarm, or recklessly creating a risk thereof," and he "had no purpose other than to

20   cause inconvenience and annoyance" to an officer making a stop. *Id.* at 108–09. The defendant

21   was not merely observing or recording the stop but was instead attempting "to engage the issuing

22   officer in conversation," which undermined the state's "legitimate interest in enforcing its traffic

23   _____

24   [3] Similar cases cited by the County are likewise irrelevant. *Wright v. City of St. Petersburg*, 833
     F.3d 1291, 1297 (11th Cir. 2016) (holding exclusion from public park did not implicate First

25   Amendment because it resulted from previous commission of crime that "manifest[ed] absolutely
     no element of protected expression") (alteration in original) (quoting *Arcara*, 478 U.S. at 705);

26   *Doe v. City of Lafayette*, 377 F.3d 757, 763–64 (7th Cir. 2004) (holding First Amendment did not
     apply to exclusion from city parks of previously convicted sex offender who "went 'cruising' in

27   the parks 'looking for children' to satisfy his sexual urges" because offender's "urges and actions
     'manifest[] absolutely no element of protected expression'") (alteration in original) (quoting

28   *Arcara,* 478 U.S. at 705).

1    laws . . . free from possible interference or interruption from bystanders." *Id.* at 109. Such activity

2    is not "protected by the First Amendment." *Id. Arcara* and *Colten* do not apply to this case, in

3    which the Ordinance criminalizes journalism by prohibiting the mere observation and thus

4    recording of events in a traditional public forum, which is protected by the First Amendment.[4]

5          **B.**      **The Ordinance is Content Based Because Its Plain Language Inherently**
       **Prohibits Recording or Reporting on Sideshows but not Other Topics at the**
6                  **Same Time and Place.**

7            The Ordinance is content based because its application inherently "depend[s] on the topic

8    or message" of speech about sideshows. Opp'n at 20:26. The Ordinance restricts presence with

9    intent to observe only a sideshow and inherently restricts only the recording of a sideshow, not

10   other topics at the same time and place, such as a building, sunset, or road sign.

11           The Ordinance is not like the law at issue in *McCullen*, which was content neutral because

12   it restricted presence in certain areas near "a reproductive health care facility" regardless of

13   purpose, intent, or subject matter. 573 U.S. at 471. Here, the Ordinance applies only to one who

14   has "the purpose of viewing, observing, watching, or witnessing the sideshow event as it

15   progresses." ACC § 10.40.020. By targeting presence with purpose to observe a sideshow, which

16   is inextricably intertwined with recording or reporting on the sideshow, the Ordinance inherently

17   "prohibits the recording of a defined topic" and is therefore "a content-based regulation of

18   speech." *Animal Legal Def. Fund*, 878 F.3d at 1204 (citation omitted).

19           The County finds no comfort in *Hill v. Colorado*, 530 U.S. 703 (2000). In that case, a

20   statute made it unlawful "to 'knowingly approach' within eight feet of another person," without

21   consent, "for the purpose of . . . engaging in oral protest, education, or counseling" within 100 feet

22   of a health care facility. *Id.* at 707. The statute was content neutral because it applied "to all

23   'protest,' to all 'counseling,' and to all demonstrators whether or not the demonstration concerns

24   abortion, and whether they oppose or support the woman who has made an abortion decision." *Id.*

25   at 708, 725. In *Hill*, oral protest, education, or counseling were means of speech that were

26   regulated as to place and manner but not content. "*Hill* instructed that, when analyzing the face of

27   _____

28   [4] *City of Seattle v. Abercrombie*, 85 Wash. App. 393 (1997), is similarly irrelevant, because this
      case does not involve "interfering with an investigation." *Id.* at 399.

1    a statute to determine its content-neutrality, the relevant question is whether the statute draws

2    distinctions among *subjects* of discussion, not among *means or types* of communication." *Hoye v.*

3    *City of Oakland*, 653 F.3d 835, 847 (9th Cir. 2011). Here, the Ordinance expressly targets only the

4    subject of sideshows and inherently prohibits recording or reporting on that topic but not others

5    such as buildings or sunsets. The Ordinance thus prohibits "reporting information only on certain

6    topics." *Project Veritas v. Ohio Election Comm'n*, 418 F. Supp. 3d 232, 258 (S.D. Ohio 2019).

7    ### C.    The Ordinance Fails Either Strict or Intermediate Scrutiny.

8    #### 1.    The Ordinance Does Not Meet Strict Scrutiny Because the County
          Retains Less Restrictive Alternatives to Serve Its Interest in Preventing
9         Unlawful Conduct.

10    The County does not seriously contend the Ordinance meets strict scrutiny. Any concern

11    for the safety of bystanders is undermined by the fact that the Ordinance applies only to persons

12    present for the purpose of observing the sideshow, not persons present for other purposes,

13    although the risk of injury is similar for both. A "law cannot be regarded as protecting an interest

14    of the highest order" when "it leaves appreciable damage to that supposedly vital interest

15    unprohibited."[5] *Republican Party v. White*, 536 U.S. 765, 780 (2002) (citation omitted).

16    The County admits that persons other than "spectators," such as "passersby and local

17    residents or workers, may be at risk of injury from sideshows," but it contends "they do not

18    present the same risks of increased unlawful behavior associated with spectators." Culley Decl.

19    ¶ 15. In doing so, the County concedes that its interest is not in protecting the safety of all but in

20    preventing the unlawful behavior of some. That interest does not justify infringing the First

21    Amendment rights of the press and public to record or report on events in a public forum, even if

22    the events involve unlawful or violent conduct by others. *Index Newspapers*, 977 F.3d at 834.

23    The County retains abundant less restrictive means to prevent unlawful conduct without

24    abridging First Amendment rights. It may enforce the plenitude of existing laws against

25    committing, aiding and abetting, or conspiring to engage in crimes associated with sideshows.

26    Pl.'s Mot. for Prelim. Inj. ("MPI") at 6:9–14, 14:5–10.  In addition, it may adopt an ordinance

27    ───────────────────

28    [5] Also, bystander safety cannot justify the prohibition on observing mere "preparations," which
     can be as minimal as the gathering of one or more vehicles or persons. ACC § 10.40.020.

1    similar to those adopted or proposed in Oakland or San Francisco that prohibit organizing or

2    aiding and abetting a sideshow without punishing members of the press or public who are simply

3    observing or documenting it.[6] *See* Oakland, Cal., Code §§ 10.74.010–10.74.090 (2023); Loy Decl.

4    ¶ 4 & Ex. 6, at 7 (proposed San Francisco ordinance). Given these "less speech-restrictive

5    alternatives to achieve public safety," the Ordinance violates the First Amendment. *Meinecke v.*

6    *City of Seattle*, 99 F.4th 514, 525 (9th Cir. 2024).

7        If sideshows have continued despite the abundance of legal means for preventing them, it

8    is not for lack of tools available to the County. In such circumstances, the problem arises from the

9    County's allocation of resources, not the laws themselves. The government's decisions on

10   allocation of resources to enforce laws against unlawful conduct cannot excuse a restriction on

11   protected speech. *Anderson*, 621 F.3d at 1065 (holding that alleged lack of resources to enforce

12   "public health" rules could not justify ban on tattooing where "the provision *vel non* of such

13   resources is a matter within the City's control").

14       Even if the County "intends to advance a compelling government interest, we will not

15   permit speech-restrictive measures when the [County] may remedy the problem by implementing

16   or enforcing laws that do not infringe on speech," and "it does not matter" whether the Ordinance

17   might "accomplish what it sets out to do," because an "unconstitutional statute that could achieve

18   positive societal results is nonetheless unconstitutional." *IMDb.com Inc. v. Becerra*, 962 F.3d

19   1111, 1125, 1128 (9th Cir. 2020) (citations omitted).

20       The County cannot rely on *Burson v. Freeman*, 504 U.S. 191 (1992), which upheld a

21   buffer zone against campaigning withing 100 feet of polling places. First, *Burson* had no majority

22   decision. Eight Justices participated. Four believed the zone was a content-based restriction on

23   speech in a traditional public forum that met strict scrutiny, and three believed it did not. *Id.* at 211

24   (plurality opinion); *id.* at 217 (Stevens, J., dissenting). One believed the zone did not impact a

25   traditional public forum and met the standard for a nonpublic forum because it was "reasonable

26   and viewpoint neutral." *Id.* at 216 (Scalia, J., concurring in the judgment). The split decision

27   _____

28   [6] Mere observation or recording of a sideshow cannot amount to aiding and abetting. *See, e.g.*, *In re K.M.*, 75 Cal. App. 5th 323, 329 (2022); *People v. Lara*, 9 Cal. App. 5th 296, 322 (2017).

1   contains no "legal standard which, when applied, will necessarily produce results with which a

2   majority of the Court from that case would agree." *Lair v. Bullock*, 697 F.3d 1200, 1205 (9th Cir.

3   2012) (citation omitted). Without such a common denominator, "the only binding aspect of a

4   splintered decision is its specific result," which is not relevant here. *Id.* (citation omitted). Second,

5   even if it were binding, the plurality's rationale turned on the unique circumstance that

6   campaigning near polling places "conflicts with . . . the right to cast a ballot in an election free

7   from the taint of intimidation and fraud." *Burson*, 504 U.S. at 211 (plurality opinion).

8   The Supreme Court rejected an attempt to invoke *Burson* in defense of a buffer zone not involving

9   polling places. *McCullen*, 573 U.S. at 496. Therefore, *Burson* applies only to polling places.

10           **2.**       **The Ordinance Fails Intermediate Scrutiny Because There Are Abundant Obvious Means to Prevent the Unlawful Conduct Involved**

11                     **in Sideshows Without Restricting Protected Speech.**

12         Assuming the Ordinance is somehow content neutral, "the government's ability to

13   permissibly restrict expressive conduct is very limited" in "traditional public fora." *Long Beach*

14   *Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1022 (9th Cir. 2009) (quoting *United*

15   *States v. Grace*, 461 U.S. 171, 177 (1983)). Under intermediate scrutiny, a content-neutral

16   restriction on the time, place, or manner of speech in a public forum must "serve a significant

17   governmental interest," be "narrowly tailored" to that interest, and "leave open ample alternative

18   channels for communication." *Id.* at 1023 (citations omitted). "The failure to satisfy any single

19   prong of this test invalidates" the restriction.[7] *Grossman v. City of Portland*, 33 F.3d 1200, 1205

20   (9th Cir. 1994) (citation omitted). Any "deference" owed to a legislature's "factual predictions"

21   does not relieve the Court of its "obligation to exercise independent judgment" on the ultimate

22   legal issues "when First Amendment rights are implicated." *Turner Broad. Sys., Inc. v. FCC*, 512

23   U.S. 622, 666 (1994).

24         Although intermediate scrutiny does not require "a stringent least-restrictive-alternative

25   test," a court may not uphold a content-neutral restriction on speech in a traditional public forum if

26    

27   [7] This test is substantively identical to *United States v. O'Brien*, 391 U.S. 367 (1968), which need
   not be discussed separately. *See, e.g.*, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288,

28   298 & n.8 (1984); *United States v. Swisher*, 811 F.3d 299, 312 & n.7 (9th Cir. 2016).

1    it "burden[s] substantially more speech than is necessary" to protect the government's alleged

2    interests. *Comite de Jornaleros*, 657 F.3d at 949 (quoting *Ward v. Rock Against Racism*, 491 U.S.

3    781, 799 (1989)). A "narrowly tailored" time, place, or manner restriction "must 'target[] and

4    eliminate[] no more than the exact source of the "evil" it seeks to remedy.'" *Berger*, 569 F.3d at

5    1041 (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)). Under intermediate scrutiny, "the

6    existence of obvious, less burdensome alternatives is a 'relevant consideration.'" *Id.* (quoting *City

7    of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993)).

8         In *Comite de Jornaleros*, the Ninth Circuit held that a content-neutral ban on curbside

9    solicitation was not narrowly tailored to serve a city's asserted interests because "[t]he City has

10   various other laws at its disposal that would allow it to achieve its stated interests while burdening

11   little or no speech," such as "laws against jaywalking . . . stopping in traffic alongside a red-

12   painted curb . . . stopping a car so as to obstruct the normal movement of traffic . . . [or]

13   interfer[ing] with the lawful movement of traffic." 657 F.3d at 949 (citations and quotation marks

14   omitted). "Even under the intermediate scrutiny 'time, place, and manner' analysis, we cannot

15   ignore the existence of these readily available alternatives." *Id.* at 950 (citations omitted).

16        This case is similar. The County has abundant alternative means to prevent sideshows.

17   As discussed above, there are numerous existing or potential laws the County could enforce or

18   adopt without infringing the First Amendment right to observe and record events in a traditional

19   public forum. Given the significant "number of feasible, readily identifiable, and less-restrictive

20   means of addressing the [County's] concerns," the "Ordinance is not narrowly tailored" even

21   under intermediate scrutiny. *Id.* at 950.

22        The County's only proof for the claim that enforcement of other laws is ineffective is the

23   conclusory assertion that "Bay Area jurisdictions have struggled to address sideshows relying only

24   on state laws criminalizing reckless driving, gun possession, and looting, and local laws

25   criminalizing organizing sideshows." Culley Decl. ¶ 13. That contention is insufficient to carry the

26   County's burden under intermediate scrutiny to "demonstrate that alternative measures that burden

27   substantially less speech would fail to achieve the government's interests, not simply that the

28   chosen route is easier." *McCullen*, 573 U.S. at 495.

1    First, it ignores multiple other laws at the County's disposal. Second, it ignores tactics that

2    have prevented sideshows elsewhere, such as investigating and arresting promoters on conspiracy

3    charges before sideshows occur. MPI at 14:22–25. Third, it does not show the level of resources

4    invested by the County in preventing sideshows; since resource allocation is within the County's

5    control, it cannot justify infringing First Amendment rights. *Anderson*, 621 F.3d at 1065. Fourth, it

6    ignores that the County could adopt an ordinance that prohibits spectators from aiding and

7    abetting sideshows without violating the First Amendment rights of the press and public to

8    observe and document them. As a result, the Ordinance fails even intermediate scrutiny.[8]

9    **D.    Fermoso Has Standing and Is Suffering Irreparable Harm Because the
       Ordinance is Chilling His First Amendment Right to Observe and Record
10      Events in a Traditional Public Forum.**

11   Fermoso wants to observe and record sideshows in Alameda County, but he is censoring

12   himself because of the Ordinance. As a result, he has standing to seek an injunction and is

13   suffering irreparable harm as a matter of law. Standing "requires a plaintiff to have suffered an

14   injury in fact, caused by the defendant's conduct, that can be redressed by a favorable result."

15   *Tingley v. Ferguson*, 47 F.4th 1055, 1066 (9th Cir. 2022) (citation omitted). Fermoso's injury is

16   ongoing self-censorship, which is caused by the Ordinance and redressable by an injunction

17   prohibiting enforcement of the Ordinance against him as a reporter.

18   When a law chills speech, the danger is "one of self-censorship," which is "a harm that can

19   be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383,

20   393 (1988). "That one should not have to risk prosecution to challenge a statute is especially true

21   in First Amendment cases, 'for free expression—of transcendent value to all society, and not

22   merely to those exercising their rights—might be the loser.'" *Bland v. Fessler*, 88 F.3d 729, 736–

23   37 (9th Cir. 1996) (quoting *Dombrowski v. Pfister,* 380 U.S. 479, 486 (1965)). For these reasons,

24   the "Supreme Court has dispensed with rigid standing requirements" for First Amendment claims

25   and has endorsed a "hold your tongue and challenge now" approach. *Cal. Pro-Life Council, Inc. v.*

26

27   ───────────────
     [8] The existence of similar ordinances elsewhere does not validate the Ordinance. *See Aptive Env't,*
28   *LLC v. Town of Castle Rock*, 959 F.3d 961, 995 (10th Cir. 2020) (holding "fact that other cities
     have similar ordinances cannot, standing alone" justify ordinance violating First Amendment).

1  *Getman*, 328 F.3d 1098, 1094 (9th Cir. 2003) (citation omitted); *see also Lopez v. Candaele*, 630

2  F.3d 775, 781 (9th Cir. 2010) (noting "unique standing considerations" in First Amendment cases

3  "tilt[] dramatically toward a finding of standing"). Therefore, "a chilling of the exercise of First

4  Amendment rights is, itself, a constitutionally sufficient injury." *Libertarian Party of L.A. Cnty. v.*

5  *Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) (citations omitted).[9]

6        Standing to bring a pre-enforcement challenge requires "an intention to engage in a course

7  of conduct arguably affected with a constitutional interest" that is "arguably . . . proscribed by [the

8  challenged] statute" and subject to a "substantial" risk of enforcement. *Peace Ranch, LLC v.*

9  *Bonta*, 93 F.4th 482, 487 (9th Cir. 2024) (alterations in original) (quoting *Susan B. Anthony List v.*

10  *Driehaus*, 573 U.S. 149, 161, 162, 164 (2014)). Fermoso intends to engage in conduct affected

11  with a constitutional interest proscribed by the challenged law because he wishes to engage in

12  speech inherently prohibited by the Ordinance. *Id.* at 488 (holding "plaintiff need not plan to break

13  the law" and "courts must ask whether the plaintiff would have the intention to engage in the

14  proscribed conduct, were it not proscribed"). A substantial risk of enforcement exists when (1)

15  there is sufficient "likelihood that the law will be enforced"; (2) the record shows "some degree of

16  concrete detail" about the plaintiff's intended expression; and (3) the law "applies to the plaintiff."

17  *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1172 (9th Cir. 2018) (citation omitted).

18        The record shows "adequate details" of Fermoso's intended expression, *id.* at 1174, given

19  his declaration that wants to observe, record, and report on sideshows in the County but is chilled

20  from doing so by the fear of arrest and prosecution. Garcia Decl. ¶¶ 22–27. The Ordinance would

21  apply to Fermoso if he observes, records, or reports on a sideshow or related preparations within

22  200 feet of the same in unincorporated areas of Alameda County, and the County has not argued

23  otherwise. Accordingly, the issue is whether there is sufficient likelihood of enforcement.

24

25  ─────────────────────

26  [9] It is irrelevant that Fermoso could potentially observe a sideshow "from the Oakland side" of an intersection. Opp'n at 32 n.14. His "standing is not defeated" by that possibility because a First Amendment right cannot be "'abridged on the plea that it may be exercised in some other place.'"

27  *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1153 n.6 (9th Cir. 2000) (quoting *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939)). Nor does standing require that he previously "attended a sideshow" to

28  report on it. Opp'n. at 9:3. It is necessary only that he wants to do so but the Ordinance chills him.

1    Standing based on self-censorship does not require that the government has enforced the

2  law in question. *Driehaus*, 573 U.S. at 158; *Italian Colors Rest.*, 878 F.3d at 1173–74; *Cal. Pro-*

3  *Life Council, Inc.*, 328 F.3d at 1094–95; *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320

4  F.3d 1002, 1006–07 (9th Cir. 2003); *Bland*, 88 F.3d at 737. A reasonable fear of prosecution exists

5  "if the plaintiff's intended speech arguably falls within the statute's reach." *Cal. Pro-Life Council*,

6  328 F.3d at 1095 (citations omitted). "A plaintiff who mounts a pre-enforcement challenge to a

7  statute that he claims violates his freedom of speech need not show that the authorities have

8  threatened to prosecute him; the threat is latent in the existence of the statute." *Id.* (quoting *Majors*

9  *v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003)).

10    Regardless of whether the County has "communicated any threat or warning of impending

11  proceedings," Fermoso's "self-censorship" is "sufficient injury" because his "fear is reasonable."

12  *Italian Colors Rest.*, 878 F.3d at 1173 (citation and quotation marks omitted). The County has not

13  disavowed enforcing the Ordinance, which favors standing. *Holder v. Humanitarian L. Project*,

14  561 U.S. 1, 15–16 (2010) (holding standing existed for First Amendment claim where government

15  "has not argued to this Court that plaintiffs will not be prosecuted if they do what they say they

16  wish to do"); *Peace Ranch*, 93 F.4th at 489–90 (noting issue of "substantial threat" of enforcement

17  "often rises or falls with the enforcing authority's willingness to disavow enforcement"); *Tingley*,

18  47 F.4th at 1068 (noting court has "interpreted the government's failure to *disavow* enforcement of

19  the law as weighing in favor of standing).

20    When "the challenged law is relatively new," as is the Ordinance, "the history of

21  enforcement . . . carries little weight" in the standing analysis. *Tingley*, 47 F.4th at 1169; *see also*

22  *Italian Colors Rest.*, 878 F.3d at 1173–74 (holding state's reliance on "sparse enforcement history

23  is misplaced" because "enforcement history alone is not dispositive"); *Bland*, 88 F.3d at 737

24  (holding plaintiff had standing due to self-censorship although "Attorney General has never

25  enforced the civil statute against anyone").

26    No "speculation" is required to support Fermoso's standing. Opp'n at 31:19. Given the

27  undisputed history of sideshows, and the fact that sideshows are continuing in the County, Lucas

28  Decl. ¶¶ 3–5, it is likely that a sideshow will recur in the County. The bare statement that one

-14-

1  officer is not "aware" of sideshows recurring in the County does not establish no sideshows are

2  happening. Culley Decl. ¶ 19. The statement lacks any factual foundation such as a review of

3  official records or list of persons contacted. Given Fermoso's experience as an award-winning

4  reporter, his history of reporting on sideshows, and the substantial public interest in his reporting,

5  Garcia Decl. ¶¶ 5–20, it is likely that he will learn of such a sideshow and be chilled from

6  reporting on it. The Ordinance is sufficient to chill his intended speech. *Cal. Pro-Life Council*, 328

7  F.3d at 1095. Any "arrests or citation of spectators" are not necessary. Opp'n at 31:13–14.

8  Fermoso's self-censorship is ongoing, "imminent," and "immediate," *Boardman v. Pac. Seafood

9  Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (citation omitted), and inherently likely to recur

10  because it "is directly traceable to a written policy." *Fellowship of Christian Athletes v. San Jose

11  Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 681 (9th Cir. 2023) (en banc).

12        Because Fermoso has at least a colorable First Amendment claim that the Ordinance is

13  chilling his speech, he is suffering irreparable harm. *Meinecke*, 99 F.4th at 526. The time between

14  adoption of the Ordinance and commencement of this action does not justify denying an

15  injunction against enforcement of a law that is continuing to chill speech. *Cuviello v. City of

16  Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). The County mistakenly cites cases not involving the

17  First Amendment. *Oakland Trib., Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1376 (9th Cir.

18  1985) ("Sherman Act"); *Spiraledge, Inc. v. Seaworld Ent., Inc.*, No. 13cv296, 2013 U.S. Dist.

19  LEXIS 96616, *2 (S.D. Cal. July 9, 2013) ("trademark infringement" and "unfair competition").

20  In any event, "courts are loath to withhold relief solely" on the ground of alleged delay. *Doe v.

21  Horne*, No. 23-16026, 2024 U.S. App. LEXIS 22847, *61 (9th Cir. Sept. 9, 2024).

22  **III.**    **CONCLUSION**

23        For the foregoing reasons, and those stated in his motion, Fermoso respectfully requests

24  that the Court grant his motion for a preliminary injunction.

25  Dated:  September 19, 2024      FIRST AMENDMENT COALITION

26                   By        */s/ David Loy*

27                           DAVID LOY
                         ANN CAPPETTA

28

DAVID LOY, Cal. Bar No. 229235
ANN CAPPETTA, Cal. Bar No. 354079
FIRST AMENDMENT COALITION
534 4th Street, Suite B
San Rafael, CA 94901-3334
Telephone: 415.460.5060
Email: dloy@firstamendmentcoalition.org
acappetta@firstamendmentcoalition.org

Attorneys for Plaintiff JOSE ANTONIO GARCIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| JOSE ANTONIO GARCIA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF ALAMEDA and YESENIA L. SANCHEZ, Sheriff of Alameda County, in her official capacity,<br><br>Defendants. | Case No. 3:24-cv-03997-RS<br><br>**DECLARATION OF DAVID LOY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: October 3, 2024<br>Time: 1:30 p.m.<br>Judge: Honorable Richard Seeborg<br>Ctrm: Courtroom 3 – 17th Floor |

1          I, DAVID LOY, declare as follows:

2          1.          I am an attorney in good standing in California and one of Plaintiff's counsel in this

3    action. I make this declaration based on personal knowledge, and if called as a witness I could and

4    would testify competently to the facts stated herein.

5          2.          According to the website of the San Francisco Board of Supervisors, proposed

6    Ordinance No. 240844 relating to sideshows was introduced at the Board's meeting on September

7    3, 2024, and referred to the Board's Public Safety and Neighborhood Services Committee.

8    *Legislation Introduced at Roll Call*, City and County of San Francisco (Sept. 3, 2024),

9    https://sfbos.org/sites/default/files/LI090324.pdf. ). A true and correct copy of said document is

10   attached hereto as Exhibit 4.[1]

11         3.          The agenda for the Public Safety and Neighborhood Services Committee's meeting

12   on September 20, 2024 lists proposed Ordinance No. 240844 and links to a page that links to the

13   text of said proposed ordinance. Public Safety and Neighborhood Services Committee, *Special*

14   *Meeting Agenda for Friday, September 20, 2024*, City and County of San Francisco (Sept. 13,

15   2024, 11:36 AM), https://sfbos.org/sites/default/files/psn092024_agenda.pdf. A true and correct

16   copy of said agenda is attached hereto as Exhibit 5.

17         4.          The draft of proposed Ordinance No. 240844 and related materials are linked at

18   https://sfgov.legistar.com/LegislationDetail.aspx?ID=6852156&GUID=6E7E8776-15A1-4078-

19   8EFF-F18E0F393B6B. The text of the draft ordinance itself is available at

20   https://sfgov.legistar.com/View.ashx?M=F&ID=13281912&GUID=8E6CDA99-6B3B-49A9-

21   89EC-331888731BC5. A true and correct copy of proposed Ordinance No. 240844 is attached

22   hereto as Exhibit 6.

23

24

25

26

27   ────────────────────

[1] The numbering of exhibits continues from Plaintiff's Exhibits 1–3, attached to the Declarations

28   of Jose Fermoso and Annie Cappetta, which were submitted with Plaintiff's opening brief on his
     motion for preliminary injunction.

1    I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct and that this declaration was executed in San Diego, California on

3  September 19, 2024.

4                                          _____
                                               */s/ David Loy*
5                                            DAVID LOY

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 4

**Board of Supervisors**



City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, CA  94102-4689
Tel. No. 415-554-5184
TDD No. 415-554-5227

## Legislation Introduced at Roll Call

## Tuesday, September 3, 2024

## Introduced by a Supervisor or the Mayor

*Pursuant to Charter Section 2.105, an Ordinance or Resolution may be introduced before the Board of Supervisors by a Member of the Board, a Committee of the Board, or the Mayor and shall be referred to and reported upon by an appropriate Committee of the Board.*

## ORDINANCES

**240840** **[Appropriation - $30,500,000 of Certificates of Participation Refunding Proceeds and Operating Revenue - FY2024-2025]**
**Sponsor:** Mayor
Ordinance appropriating $30,500,000 consisting of $29,000,000 of one or more series of Certificates of Participation Series 2024A proceeds and $1,500,000 of projected parking revenues from operation of Music Concourse Garage in the Recreation and Parks Department (REC), and placing these funds on Controller's Reserve pending the sale of the Certificates of Participation and acquisition of the Music Concourse Garage in Fiscal Year (FY) 2024-2025.  ASSIGNED to Budget and Finance Committee.

**240841** **[Delegation of Approval Authority for Contracts with OCII for Transbay Project]**
**Sponsor:** Mayor
Ordinance delegating Board of Supervisors approval authority under Charter, Section 9.118(a), to the Department of Public Works to enter into and amend contracts with the Office of Community Investment and Infrastructure ("OCII") for the Transbay Project; and authorizing the Department of Public Works to execute certain access agreements necessary to further the development of the Transbay Project.  ASSIGNED to Budget and Finance Committee.

**240842** **[Accept and Expend Grant - Retroactive - California Jobs First Catalyst Program - $14,000,000]**
**Sponsor:** Mayor
Ordinance authorizing the Office of Economic and Workforce Development to retroactively accept and expend a grant in the amount of $14,000,000 from the California Economic Development Department for the California Jobs First Catalyst Program, for the grant period of May 1, 2024, through September 30, 2026; and exempting the California Jobs First Catalyst Program subgrants from the grantmaking requirements under Administrative Code, Chapter 21G, and all other provisions in the Administrative, Environment, and Labor and Employment Codes imposing obligations or restrictions on subgrantees related to the program. (Department of Economic and Workforce Development). ASSIGNED UNDER 30 DAY RULE to Budget and Finance Committee.

**240843**   **[Administrative Code - Entertainment Zones]**
**Sponsors:** Mayor; Dorsey
Ordinance amending the Administrative Code to establish four Entertainment Zones: 1) on Maiden Lane between Kearny Street and Grant Avenue; 2) on Mark Lane and on Harlan Place between Grant Avenue and Mark Lane; 3) on Market Street between 5th Street and 6th Street, with eastern boundaries at Mason Street on the north side of Market Street and at 5th Street on the south side of Market Street, and western boundaries at the intersection of Golden Gate Avenue and Taylor Street on the north side of Market Street and at 6th Street on the south side of Market Street; and 4) the area bounded by Warriors Way on the north, Terry A. Francois Boulevard on the east, 16th Street on the south, and 3rd Street on the west; and affirming the Planning Department's determination under the California Environmental Quality Act.  ASSIGNED UNDER 30 DAY RULE to Land Use and Transportation Committee.

**240844**   **[Police Code - Vehicle Sideshows]**
**Sponsors:** Mayor; Dorsey and Stefani
Ordinance amending the Police Code to 1) prohibit persons from promoting a Vehicle Sideshow or preparations for such a sideshow; 2) prohibit persons from assembling together to obstruct the streets, sidewalks, highways, other public right-of-ways, off-street parking facilities, or private property in connection with a Vehicle Sideshow or preparations for such a sideshow; 3) prohibit persons from knowingly being present at a Vehicle Sideshow or preparations for such a sideshow for purposes of participating in the Vehicle Sideshow; 4) prohibit persons present at a Vehicle Sideshow or preparations for such a sideshow from interfering with official performance of law enforcement duties; 5) seize and impound vehicles used in a Vehicle Sideshow or preparations for such a sideshow, and under certain conditions sell the vehicles; and 6) make violations of these provisions a misdemeanor, subject to imprisonment and/or fine.  ASSIGNED to Public Safety and Neighborhood Services Committee.

**240845**   **[Building Code - Gas Infrastructure for EPCA Appliances in New Construction]**
**Sponsor:** Mandelman
Ordinance amending the Building Code to allow new construction that complies with the Design Guidelines for Electric-Ready Buildings to install gas infrastructure to serve appliances covered by the Energy Policy and Conservation Act (EPCA); adopting findings of local conditions under the California Health and Safety Code; affirming the Planning Department's determination under the California Environmental Quality Act; and directing the Clerk of the Board of Supervisors to forward this Ordinance to the California Building Standards Commission upon final passage. ASSIGNED UNDER 30 DAY RULE to Land Use and Transportation Committee.

## RESOLUTIONS

**240846**   **[Accept and Expend Grant - Retroactive - California Department of Insurance - Workers' Compensation Insurance Fraud Program - $1,154,519]**
**Sponsor:** Mayor
Resolution retroactively authorizing the Office of the District Attorney to accept and expend a grant in the amount of $1,154,519 from the California Department of Insurance for the Workers' Compensation Insurance Fraud Program, for the grant period of July 1, 2024, through June 30, 2025. (District Attorney). RECEIVED AND ASSIGNED to Budget and Finance Committee.

240847      **[Ground Lease - Abode Property Management - 1174-1178 Folsom Street and 663 Clementina Street - 100% Permanent Supportive Housing - Rent Not to Exceed $1]**
**Sponsor:** Mayor
Resolution 1) approving and authorizing the Director of Property and the Executive Director of the Department of Homelessness and Supportive Housing ("HSH") to enter into a Ground Lease with Abode Property Management for the real property owned by the City, located at 1174-1178 Folsom Street and 663 Clementina Street (collectively, the "Property"), for an initial lease term of five years with ten automatic extensions of the lease term for an additional period of five years each and a total rent not to exceed $1 in order to operate the Property as permanent supportive housing; 2) determining in accordance with Administrative Code, Section 23.33, that the below market rent payable under the Ground Lease will serve a public purpose by providing permanent supportive housing for formerly homeless and low-income households; 3) adopting findings declaring that the Property is "exempt surplus land" under the California Surplus Land Act; 4) affirming the Planning Department's determination under the California Environmental Quality Act, and adopting the Planning Department's findings of consistency with the General Plan, and the eight priority policies of the Planning Code, Section 101.1; and 5) authorizing the Director of Property and/or the HSH Executive Director to execute and make certain modifications to the Ground Lease, as defined herein, and take certain actions in furtherance of this Resolution, as defined herein.   RECEIVED AND ASSIGNED to Budget and Finance Committee.

240848      **[Grant Agreement - Abode Property Management - Property Management Services for Permanent Supportive Housing - Not to Exceed $14,177,264]**
**Sponsor:** Mayor
Resolution approving the grant agreement between Abode Property Management and the Department of Homelessness and Supportive Housing ("HSH") for property management services for permanent supportive housing at 1174-1178 Folsom Street; approving a term of November 1, 2024, through June 30, 2029, and a total not to exceed amount of $14,177,264; and authorizing HSH to enter into any amendments or other modifications to the agreement that do not materially increase the obligations or liabilities, or materially decrease the benefits to the City and are necessary or advisable to effectuate the purposes of the agreement. (Department of Homelessness and Supportive Housing). RECEIVED AND ASSIGNED to Budget and Finance Committee.

**240849**   **[Commercial Ground Lease - Broadway Davis Retail Associates LLC - 725 Davis Street - First Amendment to Residential Ground Lease - 735 Davis Senior, L.P. - 735 Davis - Annual Base Rent of $1]**
**Sponsor:** Mayor
Resolution 1) approving and authorizing the Director of Property and the Mayor's Office of Housing and Community Development ("MOHCD") to enter into a Commercial Ground Lease for Real Property owned by the City and located at 725 Davis Street (the "Commercial Property") with Broadway Davis Retail Associates LLC, for a lease term of 70 years and one 24-year option to extend and an annual base rent of $1 ("Commercial Ground Lease"), in order to develop ground floor commercial space for community-serving uses ("Commercial Project"); 2) approving and authorizing the Director of Property and the Director of MOHCD to enter into a First Amendment to Residential Ground Lease to remove the Commercial Property from the leased premises under the Ground Lease between the City and 735 Davis Senior, L.P., related to a 52-unit affordable housing development for low-income seniors, including 15 units for homeless seniors; 3) adopting findings that the Project and proposed transactions are consistent with the General Plan, and the eight priority policies of Planning Code, Section 101.1; 4) determining that the less than market rent payable under the Commercial Ground Lease will serve a public purpose by providing commercial spaces for community-serving spaces, in accordance with Administrative Code, Section 23.3; and 5) authorizing the Director of Property and/or the Director of MOHCD to execute the Commercial Ground Lease and the First Amendment to Residential Ground Lease and make certain modifications to such agreements, as defined herein, and take certain actions in furtherance of this Resolution, as defined herein.  RECEIVED AND ASSIGNED to Budget and Finance Committee.

**240850**   **[Accept and Expend Grant - Retroactive - National Institutes of Health - Heluna Health - The Bridge Clinic: Optimizing Injectable PrEP Delivery for Transgender and Non-Binary People - $160,074]**
**Sponsors:** Mayor; Mandelman, Dorsey and Engardio
Resolution retroactively authorizing the Department of Public Health to accept and expend a grant increase from the National Institutes of Health through Heluna Health for participation in a program, entitled "The Bridge Clinic: Optimizing Injectable PrEP Delivery for Transgender and Non-Binary People," in the amount of $88,930 for the period of February 22, 2024, through January 31, 2025, for a total amount of $160,074 for the total period of April 1, 2023, through January 31, 2025. (Public Health Department). RECEIVED AND ASSIGNED to Budget and Finance Committee.

**240851**   **[Setting Property Tax Rate and Establishing Pass-Through Rates for Residential Tenants - FY2024-2025]**
**Sponsor:** Chan
Resolution levying property taxes at a combined rate of $1.17143563 on each $100 valuation of taxable property for the City and County of San Francisco, San Francisco Unified School District, San Francisco County Office of Education, San Francisco Community College District, Bay Area Rapid Transit District, and Bay Area Air Quality Management District; and establishing pass-through rates per $100 of assessed value for residential tenants and based on tenancy commencement dates pursuant to Administrative Code, Chapter 37, for the Fiscal Year (FY) ending June 30, 2025.  RECEIVED AND ASSIGNED to Budget and Finance Committee.

**240852**   **[Transit Month - September 2024]**
**Sponsors:** Mandelman; Dorsey, Ronen, Melgar, Safai, Engardio, Stefani, Walton, Preston and Peskin
Resolution proclaiming September 2024 as the Ninth Annual San Francisco Transit Month in the City and County of San Francisco.  REFERRED FOR ADOPTION WITHOUT COMMITTEE REFERENCE AGENDA AT THE NEXT BOARD MEETING.

**240853** **[Use Agreement - CSUITEMUSIC, LLC - Documentary "SFPD Journey to Justice"]**
**Sponsor:** Melgar
Resolution retroactively authorizing the San Francisco Police Department ("SFPD") to enter into a Use Agreement with CSUITEMUSIC, LLC ("Producer") to develop and produce a documentary, entitled "SFPD Journey to Justice," about Sojourn to the Past, a retracing of the Civil Rights Movement and its connection to the modern policing profession, granting all necessary trademark licenses and rights to traditional and digital networks. (Police Department). REFERRED FOR ADOPTION WITHOUT COMMITTEE REFERENCE AGENDA AT THE NEXT BOARD MEETING.

**240854** **[Consolidation of Elections Scheduled for November 5, 2024]**
**Sponsor:** Peskin
Resolution consolidating the following elections, all of which will be held on November 5, 2024, the State of California General Election; the City and County of San Francisco Municipal Election; City and County of San Francisco's Special Bond Election; the Bay Area Rapid Transit District Election; the San Francisco Unified School District Board of Education (School Board) Election; the School Board Special Election for General Obligation Bonds; and the San Francisco Community College Board of Trustees Election; and providing that the election precincts, voting places, and officers for these elections shall be the same as for the State General Election. REFERRED FOR ADOPTION WITHOUT COMMITTEE REFERENCE AGENDA AT THE NEXT BOARD MEETING.

**240855** **[Approval of a 180-Day Extension for Planning Commission Review of New Rooftop Floor Area or Building Volume on Noncomplying Structure at 1896 Pacific Avenue (File No. 240729)]**
**Sponsor:** Stefani
Resolution extending by 180 days the prescribed time within which the Planning Commission may render its decision on an Ordinance (File No. 240729) amending the Planning Code to permit new floor area or building volume on the rooftop of a noncomplying structure located at 1896 Pacific Avenue, on Assessor's Parcel Block No. 0576, Lot Nos. 27-44; affirming the Planning Department's determination under the California Environmental Quality Act; making public necessity, convenience, and welfare findings under Planning Code, Section 302; and making findings of consistency with the General Plan, and the eight priority policies of Planning Code, Section 101.1.  REFERRED FOR ADOPTION WITHOUT COMMITTEE REFERENCE AGENDA AT THE NEXT BOARD MEETING.

**240856** **[National Service Dog Awareness Month - September 2024]**
**Sponsor:** Stefani
Resolution recognizing September 2024 as National Service Dog Awareness Month in the City and County of San Francisco.  REFERRED FOR ADOPTION WITHOUT COMMITTEE REFERENCE AGENDA AT THE NEXT BOARD MEETING.

## MOTIONS

**240835** **[Appointment, Child Care Planning and Advisory Council - Claudia Quinonez]**
Motion appointing Claudia Quinonez (residency requirement waived), term ending March 19, 2027, to the Child Care Planning and Advisory Council (District 4). (Clerk of the Board). RECEIVED AND ASSIGNED to Rules Committee.

**240839**   **[Mayoral Appointment, Public Works Commission - Eleanor Blume]**
Motion approving/rejecting the Mayor's nomination for the appointment of Eleanor Blume to the Public Works Commission, for a term ending July 2, 2026. (Clerk of the Board). RECEIVED AND ASSIGNED to Rules Committee.

## Introduced at the Request of a Department

*Pursuant to Rules of Order of the Board of Supervisors Section 2.7.1, Department Heads may submit proposed legislation to the Clerk of the Board, in which case titles of the legislation will be printed at the rear of the next available agenda of the Board.*

## PROPOSED ORDINANCES

**240823**   **[Settlement of Lawsuit - San Francisco Apartment Association, San Francisco Association of Realtors, Coalition for Better Housing, and Small Property Owners of San Francisco Institute - $93,000]**
Ordinance authorizing settlement of the lawsuit filed by San Francisco Apartment Association, San Francisco Association of Realtors, Coalition for Better Housing, and Small Property Owners of San Francisco Institute against the City and County of San Francisco for $93,000; the lawsuit was filed on May 12, 2020, in San Francisco County Superior Court, Case No. CPF 20-517087; entitled San Francisco Apartment Association, et al. v. City and County of San Francisco; the lawsuit involves a Petition for Writ of Mandate challenging Ordinance No. 36-20, which amended San Francisco Administrative Code § 37.9E to revise the requirements that landlord must follow when engaging in buyout negotiations with tenants. (City Attorney). RECEIVED AND ASSIGNED to Government Audit and Oversight Committee.

**240824**   **[Settlement of Lawsuits - Park Hotels & Resorts Inc. - Stipulated Assessed Value of $140,700,000 and Refund of $943,740 Plus Statutory Interest]**
Ordinance authorizing settlement of two related lawsuits filed by Park Hotels & Resorts Inc. et al. against the City and County of San Francisco concerning the real property located at 555 North Point, San Francisco, CA (Assessor's Parcel Block No. 0029, Lot No. 007) (the "Subject Property") for a stipulated assessed value of the Subject Property of $140,700,000 as of September 17, 2019, contingent upon the Assessment Appeals Board's approval, and a refund of $943,740 plus statutory interest; the first lawsuit was filed on August 7, 2023, in San Francisco Superior Court, Case No. CGC-23-608156; entitled Park Hotels & Resorts Inc., et al. v. City and County of San Francisco; the second lawsuit was filed on June 27, 2023, in San Francisco Superior Court, Case No. CGC-23-607311; entitled Park Hotels & Resorts Inc. v. City and County of San Francisco, et al.; the lawsuits involve the assessed value of the Subject Property for property tax purposes as of the September 17, 2019 change in ownership date and a transfer tax refund. (City Attorney). RECEIVED AND ASSIGNED to Government Audit and Oversight Committee.

240825 **[Settlement of Lawsuits - Park Hotels & Resorts Inc. - Stipulated Assessed Value of $93,237,202 and Refund of $785,531 Plus Statutory Interest]**
Ordinance authorizing settlement of two related lawsuits filed by Park Hotels & Resorts Inc. et al. against the City and County of San Francisco concerning the real property located at 542-550 Geary Street, San Francisco, CA (Assessor's Parcel Block No. 0305, Lot No. 008 and Assessor's Parcel Block No. 0305, Lot No. 009) (the "Subject Property") for a stipulated assessed value of $93,237,202 as of September 18, 2019, contingent upon the Assessment Appeals Board's approval, and a refund of $785,531 plus statutory interest; the first lawsuit was filed on August 18, 2023, in San Francisco Superior Court, Case No. CGC-23-608476; entitled Park Hotels & Resorts Inc., et al. v. City and County of San Francisco; the second lawsuit was filed on June 27, 2023, in San Francisco Superior Court, Case No. CGC-23-607309; entitled Park Hotels & Resorts Inc. v. City and County of San Francisco, et al.; the lawsuits involve the assessed value of the Subject Property for property tax purposes as of the September 18, 2019 change in ownership date and a transfer tax refund. (City Attorney). RECEIVED AND ASSIGNED to Government Audit and Oversight Committee.

240826 **[Settlement of Lawsuits - Park Hotels & Resorts Inc. - Stipulated Assessed Value of $222,145,336 and Refund of $1,636,749 Plus Statutory Interest]**
Ordinance authorizing settlement of two related lawsuits filed by Park Hotels & Resorts Inc. et al. against the City and County of San Francisco concerning the real property located at 375 Battery Street, San Francisco, CA (Assessor's Parcel Block No. 0229, Lot No. 020) (the "Subject Property") for a stipulated assessed value of the Subject Property of $222,145,336 as of September 18, 2019, contingent upon the Assessment Appeals Board's approval, and a refund of $1,636,749, plus statutory interest; the first lawsuit was filed on August 18, 2023, in San Francisco Superior Court, Case No. CGC-23-608468; entitled Park Hotels & Resorts Inc., et al. v. City and County of San Francisco; the second lawsuit was filed on June 27, 2023, in San Francisco Superior Court, Case No. CGC-23-607304; entitled Park Hotels & Resorts Inc. v. City and County of San Francisco, et al.; the lawsuits involve the assessed value of the Subject Property for property tax purposes as of the September 18, 2019, change in ownership date and a transfer tax refund. (City Attorney). RECEIVED AND ASSIGNED to Government Audit and Oversight Committee.

## PROPOSED RESOLUTIONS

240828 **[Participation Agreement - Retroactive - Federal Centers for Medicare & Medicaid Services - Innovative Dementia Care Program - Anticipated Revenue to the City $3,500,000]**
Resolution retroactively authorizing the San Francisco Department of Public Health ("DPH") to enter into a Participation Agreement with the Federal Centers for Medicare & Medicaid Services to provide federal funding for an innovative dementia care program, for a term of 10 years and 26 days from June 5, 2024, through June 30, 2034, having anticipated revenue of $3,500,000 and authorizing DPH to make necessary, non-material changes to the agreement that DPH determines, in consultation with the City Attorney, are necessary to correct clerical and/or administrative errors, as long as those changes are consistent with this Resolution. (Public Health Department). RECEIVED AND ASSIGNED to Budget and Finance Committee.

**240829** **[Agreement Amendment - Hunters Point Family - Pit Stop Workforce Development Grant Program - Not to Exceed $16,238,478.52]**
Resolution approving Amendment No. 5 to Contract No. 1000029167 between the City, acting by and through the Department of Public Works, and Hunters Point Family, to create employment opportunities, job training and workforce development programs, and ensure the availability of safe and clean public restrooms for the Pit Stop Workforce Development Grant Program, extending the term by 11 months for a total term of July 1, 2023, through June 30, 2025, increasing the contract amount by $6,972,047.52 for a new total not to exceed amount from of $16,238,478.52; and to authorize the Director of Public Works to make necessary, non-material changes to the Amendment before its execution. (Public Works Department). RECEIVED AND ASSIGNED to Budget and Finance Committee.

**240830** **[Settlement of Unlitigated Claims - Maplebear, Inc. - $8,250,342.21]**
Resolution approving the settlement of the unlitigated claims filed by Maplebear, Inc. against the City and County of San Francisco for $8,250,342.21; the claims were filed on February 28, 2023, and February 9, 2024; the claims involve a refund of payroll expense, gross receipts, and homelessness gross receipts taxes, and business registration fees for the 2019 to 2022 tax years; other material terms of the settlement are that Maplebear, Inc. shall take certain filing positions with respect to its gross receipts, homelessness gross receipts, and overpaid executive gross receipts taxes, as applicable, for the 2023 and subsequent tax years, and the City will not impose penalties arising from those filing positions for the 2023 tax year. (City Attorney). RECEIVED AND ASSIGNED to Government Audit and Oversight Committee.

**240831** **[Settlement of Unlitigated Claim - Bechtel Group, Inc. - $43,235.10]**
Resolution approving the settlement of the unlitigated claim filed by Bechtel Group, Inc. against the City and County of San Francisco for $43,235.10; the claim was filed on May 8, 2024; the claim involves a refund of commercial rents taxes. (City Attorney). RECEIVED AND ASSIGNED to Government Audit and Oversight Committee.

**240832** **[Contract Agreement - Retroactive - Corporation for Network Initiatives in California - Fiber Optic Network Installation, Occupancy, and Maintenance - Anticipated Revenue to the City $6,970,000]**
Resolution retroactively authorizing the Department of Technology to enter into a contract with Corporation for Education Network Initiatives in California ("CENIC") and to provide fiber optic cable strands to establish a fiber optic network in support of CENIC services to provide data connectivity for the University of California, San Francisco ("UCSF") for the period between May 25, 2011, through May 25, 2031, with an expected revenue of $6,970,000. (Department of Technology). RECEIVED AND ASSIGNED to Budget and Finance Committee.

**Clerk to Act – September 3, 2024**


**Regular Board Meeting Minutes for July 2, 2024, July 9, 2024, July 16, 2024, and July 23, 2024, and the Special Board Meeting Minutes for July 23, 2024 (9:00 a.m.), and July 23, 2024 (9:05 a.m.) were approved.**


**<u>Requests Granted</u>**
None.


**<u>In Memoriam</u>**
Adam A. Banks - Board President Aaron Peskin

# EXHIBIT 5



# City and County of San Francisco

### Meeting Agenda

## Public Safety and Neighborhood Services Committee

City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, CA  94102-4689

*Members: Catherine Stefani, Joel Engardio, Matt Dorsey*

*Clerk: Monique Crayton*
*(415) 554-7750 ~ monique.crayton@sfgov.org*

| Friday, September 20, 2024 | 1:00 PM | City Hall, Legislative Chamber, Room 250 |
|---|---|---|
| | **Special Meeting** | |

## ROLL CALL AND ANNOUNCEMENTS

## COMMUNICATIONS

## AGENDA CHANGES

## REGULAR AGENDA

**1.**   **240844**   **[Police Code - Vehicle Sideshows]**
Sponsors: Mayor; Dorsey and Stefani
Ordinance amending the Police Code to 1) prohibit persons from promoting a Vehicle Sideshow or preparations for such a sideshow; 2) prohibit persons from assembling together to obstruct the streets, sidewalks, highways, other public right-of-ways, off-street parking facilities, or private property in connection with a Vehicle Sideshow or preparations for such a sideshow; 3) prohibit persons from knowingly being present at a Vehicle Sideshow or preparations for such a sideshow for purposes of participating in the Vehicle Sideshow; 4) prohibit persons present at a Vehicle Sideshow or preparations for such a sideshow from interfering with official performance of law enforcement duties; 5) seize and impound vehicles used in a Vehicle Sideshow or preparations for such a sideshow, and under certain conditions sell the vehicles; and 6) make violations of these provisions a misdemeanor, subject to imprisonment and/or fine.

9/3/24; ASSIGNED to the Public Safety and Neighborhood Services Committee.

9/6/24; REFERRED TO DEPARTMENT.

*The Chair intends to entertain a motion to refer this item to the full Board as a Committee Report for consideration on September 24, 2024.*

## ADJOURNMENT

*NOTE:  Pursuant to Government Code Section 65009, the following notice is hereby given: if you challenge, in court, the general plan amendments or planning code and zoning map amendments described above, you may be limited to raising only those issues you or someone else raised at the public hearing described in this notice, or in written correspondence delivered to the Board of Supervisors at, or prior to, the public hearing.*

# LEGISLATION UNDER THE 30-DAY RULE

*NOTE:  The following legislation will not be considered at this meeting.  Board Rule 3.22 provides that when an Ordinance or Resolution is introduced which would CREATE OR REVISE MAJOR CITY POLICY, the Committee to which the legislation is assigned shall not consider the legislation until at least thirty days after the date of introduction.  The provisions of this rule shall not apply to the routine operations of the departments of the City or when a legal time limit controls the hearing timing.  In general, the rule shall not apply to hearings to consider subject matter when no legislation has been presented, nor shall the rule apply to resolutions which simply URGE action to be taken.*

*There are no items pending under the 30-day rule.*

### The Levine Act

Pursuant to California Government Code, Section 84308, Members of the Board who have received campaign contributions totaling more than $250 may be required to disclose that fact on the record of the proceeding. Parties and their paid agents may also be required to disclose on the record any campaign contributions made to a Member of the Board that meets the following qualifications for disclosure. A Member of the Board of Supervisors is disqualified and must recuse themselves on any agenda item involving business, professional, trade, and land use licenses or permits and all other entitlements for use, if they received more than $250 in campaign contributions from the applicant or contractor, an agent of the applicant or contractor, or any financially interested participant within the 12 months prior to the final decision; and for 12 months following the date of the final decision, a Member of the Board shall not accept, solicit, or direct a campaign contribution of $250 or more from the applicant or contractor, an agent of the applicant or contractor, or any financially interested participant. The foregoing statements do not constitute legal advice. Parties, participants, and their agents are urged to consult their own legal counsel regarding the requirements of the law. For more information about these disclosures, visit www.sfethics.org.

### Agenda Item Information

Each item on the Consent or Regular agenda may include the following 1) Legislation; 2) Budget and Legislative Analyst report; 3) Department or Agency cover letter and/or report; 4) Public correspondence. These items are available for review at City Hall, 1 Dr. Carlton B. Goodlett Place, Room 244 or at www.sfbos.org/legislative-research-center-lrc.

### Meeting Procedures

The Board of Supervisors is the legislative body of the City and County of San Francisco. The Board has several standing committees where legislation is the subject of hearings at which members of the public are urged to testify. The full Board does not hold a second public hearing on measures which have been heard in committee.

Board procedures do not permit: 1) vocal or audible support or opposition to statements by Supervisors or by other persons testifying; 2) ringing and use of cell phones or electronic devices; 3) bringing in or displaying signs in the meeting room; or 4) standing in the meeting room. Each member of the public will be allotted the same maximum number of minutes to speak as set by the President or Chair at the beginning of each item or public comment, excluding City representatives; except that public speakers using interpretation assistance will be allowed to testify for twice the amount of time. Members of the public who want to display a document should place it on the overhead during their public comment and remove the document when they want the screen to return to live coverage of the meeting.

IMPORTANT INFORMATION: The public is encouraged to testify at Board and Committee meetings. Persons unable to attend the meeting may submit to the City, by the time the proceedings begin, written comments regarding agenda items for the official public record. Written communications should be submitted to the Clerk of the Board or the Clerk of the Committee: 1 Dr. Carlton B. Goodlett Place, Room 244, San Francisco, CA 94102. Communications not received prior to the hearing may be delivered to the Clerk of the Board or the Clerk of the Committee and will be shared with the Members.

COPYRIGHT: All system content that is broadcasted live during public proceedings is secured by High-bandwidth Digital Content Protection (HDCP), which prevents copyrighted or encrypted content from being displayed or transmitted through unauthorized devices. Members of the public who wish to utilize chamber digital, audio and visual technology may not display copyrighted or encrypted content during public proceedings.

LANGUAGE INTERPRETERS: Language services are available in Spanish, Chinese and Filipino for requests made at least two (2) business days in advance of the meeting, to help ensure availability. For more information or to request services, contact bos@sfgov.org or call (415) 554-5184.

傳譯服務：所有常規及特別市參事會會議和常務委員會會議將提供西班牙文，中文以及菲律賓文的傳譯服務，但必須在會議前最少兩（2）個工作日作出請求，以確保能獲取到傳譯服務。將因應請求提供交替傳譯服務，以便公眾向有關政府機構發表意見。如需更多資訊或請求有關服務，請發電郵至 bos@sfgov.org 或致電（415）554-5184 聯絡我們。

INTÉRPRETES DE IDIOMAS: Para asegurar la disponibilidad de los servicios de interpretación en chino, filipino y español, presente su petición por lo menos con dos (2) días hábiles de antelación previo a la reunión. Para más

información o para solicitar los servicios, envíe su mensaje a bos@sfgov.org o llame al (415) 554-5184.

TAGA SALIN-WIKA: Ipaabot sa amin ang mga kahilingan sa pag salin-wika sa Kastila, Tsino at Pilipino ng hindi bababa sa dalawang araw bago ang pulong. Makakatulong ito upang  tiyakin na ang mga serbisyo ay nakalaan at nakahanda. Para sa dagdag kaalaman o para humiling ng serbisyo, maki pagugnayan po sa bos@sfgov.org o tumawag sa (415) 554-5184.

### Americans with Disabilities Act (ADA) and Reasonable Accommodations

Title II of the ADA requires that all programs offered through the state and local government such as the City and County of San Francisco be accessible and usable to people with disabilities. The ADA and City policy require that people with disabilities have equal access to all City services, activities, and benefits. If you believe your rights under the ADA are violated, contact the ADA Coordinator. Ordinance No. 90-10 added Section 2A.22.3 to the Administrative Code, which adopted a Citywide Americans with Disabilities Act Reasonable Modification Policy.

Meetings are real-time captioned and cablecast open-captioned on SFGovTV (www.sfgovtv.org) or Cable Channels 26, 28, 78 or 99 (depending on your provider). Board and Committee meeting agendas and minutes are available on the Board's website www.sfbos.org and adhere to web development Federal Access Board's Section 508 Guidelines. For reasonable accommodations, please contact (415) 554-5184 or (415) 554-5227 (TTY). Board of Supervisors' Rules of Order 1.3.3 does not permit remote public comment by members of the public at meetings of the Board and its committees, except as legally required to enable people with disabilities to participate in such meetings.  If you require remote access as a means of reasonable accommodation under ADA, please contact the Clerk's Office to request remote access, including a description of the functional limitation(s) that precludes your ability to attend in person. Requests made at least two (2) business days in advance of the meeting will help to ensure availability. For further assistance, please call (415) 554-5184.

### Know Your Rights Under The Sunshine Ordinance

Commissions, boards, councils, and other agencies of the City and County exist to conduct the people's business. This ordinance assures that deliberations are conducted before the people and that City operations are open to the people's review. For information on your rights under the Sunshine Ordinance (San Francisco Administrative Code, Chapter 67) or to report a violation of the ordinance, contact by mail Sunshine Ordinance Task Force, 1 Dr. Carlton B. Goodlett Place, Room 244, San Francisco CA 94102; phone at (415) 554-7724; fax at (415) 554-5163; or by email at sotf@sfgov.org. Citizens may obtain a free company of the Sunshine Ordinance by printing the San Francisco Administrative Code, Chapter 67, on the Internet at www.sfbos.org/sunshine.

### Ethics Requirements

Individuals and entities that influence or attempt to influence local legislative or administrative action may be required by the San Francisco Lobbyist Ordinance (Campaign & Governmental Conduct Code, Section 2.100) to register and report lobbying activity. For more information about the Lobbyist Ordinance, please contact the Ethics Commission at 25 Van Ness Avenue, Suite 220, San Francisco, CA 94102; (415) 252-3100; fax (415) 252-3112; website www.sfgov.org/ethics.

Under Campaign and Governmental Conduct Code, Section 1.127, no person or entity with a financial interest in a land use matter pending before the Board of Appeals, Board of Supervisors, Building Inspection Commission, Commission on Community Investment and Infrastructure, Historic Preservation Commission, Planning Commission, Port Commission, or the Treasure Island Development Authority Board of Directors, may make a campaign contribution to a member of the Board of Supervisors, the Mayor, the City Attorney, or a candidate for any of those offices, from the date the land use matter commenced until 12 months after the board or commission has made a final decision, or any appeal to another City agency from that decision has been resolved. For more information about this restriction, visit www.sfethics.org.

# EXHIBIT 6

FILE NO.  240844                                ORDINANCE NO.

1    [Police Code - Vehicle Sideshows]

2

3    **Ordinance amending the Police Code to 1) prohibit persons from promoting a Vehicle**

4    **Sideshow or preparations for such a sideshow; 2) prohibit persons from assembling**

5    **together to obstruct the streets, sidewalks, highways, other public right-of-ways, off-**

6    **street parking facilities, or private property in connection with a Vehicle Sideshow or**

7    **preparations for such a sideshow; 3) prohibit persons from knowingly being present at**

8    **a Vehicle Sideshow or preparations for such a sideshow for purposes of participating**

9    **in the Vehicle Sideshow; 4) prohibit persons present at a Vehicle Sideshow or**

10   **preparations for such a sideshow from interfering with official performance of law**

11   **enforcement duties; 5) seize and impound vehicles used in a Vehicle Sideshow or**

12   **preparations for such a sideshow, and under certain conditions sell the vehicles; and**

13   **6) make violations of these provisions a misdemeanor, subject to imprisonment and/or**

14   **fine.**

15   NOTE:     **Unchanged Code text and uncodified text** are in plain Arial font.
              **Additions to Codes** are in _single-underline italics Times New Roman font_.
16            **Deletions to Codes** are in ~~_strikethrough italics Times New Roman font_~~.
              **Board amendment additions** are in <u>double-underlined Arial font</u>.
17            **Board amendment deletions** are in ~~Board amendment deletions~~.
              **Asterisks (*   *   *)** indicate the omission of unchanged Code
18            subsections or parts of tables.

19

20   Be it ordained by the People of the City and County of San Francisco:

21

22   Section 1.  Article 56 of the Police Code is hereby amended by revising Sections 5600

23   and 5601, revising existing Section 5602 and renumbering it as Section 5609, and adding new

24   Sections 5602, 5603, 5604, 5605, 5606, 5607, 5608, 5610, and 5611, to read as follows:

25   //

Mayor Breed; Supervisors Dorsey, Stefani
**BOARD OF SUPERVISORS**                                                       Page 1

1          **ARTICLE 56: ~~MOTOR~~ VEHICLE <u>SIDESHOWS</u>~~STUNT DRIVING~~**

2          **SEC. 5600. FINDINGS.**

3          (a)   In recent years, San Francisco has seen a rise in <u>size and severity of illegal Vehicle</u>

4    <u>Sideshows, ~~"motor vehicle stunt driving,"~~</u> which include~~s~~ reckless driving, vehicle speed contests,

5    and/or exhibitions that involve stunts and tricks with vehicles. In some instances, the <u>Vehicle</u>

6    <u>Sideshow</u>~~motor vehicle stunt driving~~ features ~~cars~~ <u>vehicles and dirt bikes</u> weaving and speeding

7    along thoroughfares, spinning "doughnuts," and screeching tires while passengers hang out

8    the windows, drawing crowds of spectators <u>that are encouraging and instigating the Vehicle</u>

9    <u>Sideshows</u>. In other instances, the ~~cars~~ <u>vehicles</u> speed in unison. The various stunts and tricks

10   featured during <u>Vehicle Sideshows</u>~~motor vehicle stunt driving~~ are extremely dangerous and

11   imperil both willing spectators and uninvolved bystanders, as well as participants. In the San

12   Francisco Bay Area, the use of vehicles for stunts and tricks has caused serious injuries and

13   death to not only participants and spectators but also to bystanders.

14          (b)   <u>In 2020, San Francisco enacted Article 56 in light of the following incidents:</u>  ~~As of the~~

15   ~~enactment of this Article 56, among the more recent instances of motor vehicle stunt driving in San~~

16   ~~Francisco were the following:~~

17          On February 23, 2020, there were four illegal <u>Vehicle Sideshows</u>~~motor vehicle stunt~~

18   ~~driving exhibitions~~ involving 50 to 100 ~~cars~~ <u>vehicles</u> in San Francisco. Several ~~cars~~ <u>vehicles</u> sped

19   through City neighborhoods engaging in reckless driving behavior. Motor vehicles blocked

20   street intersections and engaged in tricks and stunts that included driving in continuous "figure

21   eights" with screeching tires, and "doughnut" contests. Dozens of spectators crowded the

22   streets and sidewalks in very close proximity to the vehicles to watch the exhibitions, creating

23   a major public safety concern for everyone.

24          On August 24, 2020, there was an illegal <u>Vehicle Sideshow</u>~~motor vehicle stunt driving~~

25   ~~exhibition~~ in San Francisco where vehicles orbited an intersection performing continuous

1   "doughnuts" and sending burnt rubber smoke from tires into the air as passengers hung out

2   the window. Approximately 100 spectators cheered on the spinning _vehicles_~~cars~~. At one point,

3   a ~~p~~_P_articipating driver lost control of his vehicle, forcing spectators to move back

4   unexpectedly. There were spectator vehicles that blocked all access to entry of the exhibition

5   intersection. Nearby, gun shots were fired.

6           On September 6, 2020, an illegal _Vehicle Sideshow_~~motor vehicle stunt driving~~

7   ~~exhibition~~ in San Francisco attracted hundreds of spectators and approximately 50 vehicles.

8   There were approximately 100 calls for police service for this event from residents concerned

9   about public safety. A man was shot to death in the immediate vicinity of the reckless stunt

10  driving exhibition.

11          _(c) Since 2020, Vehicle Sideshows have continued to occur in the San Francisco Bay Area._

12  _They have been increasing in severity and size, and are becoming a greater community safety concern._

13  _The majority of Vehicle Sideshow occur late at night or during the early morning hours.  But San_

14  _Francisco experienced a Vehicle Sideshow on Sunday, August 25, 2024 in the afternoon, creating a_

15  _bigger public safety concern as there were more people and law-abiding drivers using the public_

16  _streets and sidewalks at that time.  In 2024, there have been at least 25 Vehicle Sideshows reported in_

17  _San Francisco and as of September 2024 the Police Department ("SFPD") had seized 67 vehicles in_

18  _connection with these incidents during the year.  Some of the most notable Vehicle Sideshows of 2024_

19  _were:_

20          _On June 9, 2024, several Vehicle Sideshows occurred across the San Francisco Bay Area that_

21  _involved huge crowds of spectators who followed the Sideshows to various locations. In San Francisco,_

22  _a Vehicle Sideshow occurred on the Embarcadero and drew over 200 spectators event.  The crowd of_

23  _people blocked streets and sidewalks as they encouraged the drivers who engaged in the dangerous_

24  _vehicle stunts.  During the Vehicle Sideshow, a vehicle was engulfed in flames near the Embarcadero,_

25  _which  presented a huge public safety risk and required an enormous amount of resources to contain._

1    *SFPD seized five vehicles at the scene and dispersed the large crowd.  Following the Vehicle Sideshow,*

2    *splinter Vehicle Sideshows occurred at Alemany Boulevard and Geneva Avenue, on Valencia Street,*

3    *and on Cesar Chavez Street.  SFPD eventually dispersed the splinter Sideshows.*

4        *On August 25, 2024, a huge Vehicle Sideshow of dirt bikes and all-terrain vehicles ("ATVs")*

5    *took place throughout various neighborhoods in San Francisco drawing 200-250 spectators*

6    *encouraging and instigating the illegal activity.  The spectators, ATVs, and dirt bikes collectively*

7    *overtook several streets in San Francisco.  The riders ignored traffic laws, performed stunts, and*

8    *caused widespread disruption by blocking streets and sidewalks that impacted our neighborhoods.*

9    *(d) According to SFPD, there have been other illegal activities associated with Vehicle*

10    *Sideshows, including shootings, weapons possession, explosives, illegal fireworks, assaults, vandalism,*

11    *and public intoxication.  Sideshow participants and spectators are often hostile, aggressive, and*

12    *uncooperative with law enforcement officers and have on occasion been assaultive towards officers*

13    *attempting to contain and dismantle the illegal activity.*

14    (~~ee~~)   There is no place for this type of motorized misconduct in a heavily populated

15    urban environment such as San Francisco. At a minimum, *Vehicle Sideshows*~~motor vehicle stunt~~

16    ~~driving~~ in the City create~~s~~ chaos, inconvenience, and in some cases fear, among those who

17    live in neighborhoods where ~~it~~ *they* occur~~s~~; and ~~it~~ *they* present~~s~~ challenges for law-abiding

18    drivers whose routes unfortunately take them to an area where such irresponsible antics are

19    occurring. Of even greater concern, the possibility that serious injury or death may result from

20    *Vehicle Sideshows* ~~motor vehicle stunt driving~~ is ever-present.

21    *(f)  Vehicle Sideshow participants and spectators do not stay in one area. They travel on our*

22    *highways and bridges to come into our city and cause havoc in San Francisco and the Bay Area.  The*

23    *SFPD works closely with its law enforcement partners in the region to address the illegal activities.*

24    *The SFPD uses technology, such as automatic license plate readers, commonly known as "ALPRs,"*

25    *and unassisted aerial vehicles," commonly known as "UAVs" or "drones," to combat Vehicle*

1    *Sideshows and their attendant ills.  This Article 56 provides additional legal tools for the City to*

2    *combat Vehicle Sideshows.*

3    **SEC. 5601. ~~MOTOR~~ VEHICLE *SIDESHOW* ~~STUNT DRIVING~~: DECLARATION OF**

4    **POLICY.**

5    It is the policy of the City and County of San Francisco to protect the health and

6    safety of residents by enforcing state *and local* laws that prohibit persons from engaging in

7    *Vehicle Sideshows*~~reckless driving, motor vehicle speed contests, and exhibitions that involve stunts~~

8    ~~and tricks with vehicles,~~ and that prohibit persons from aiding and abetting such activities.

9    *SEC. 5602. DEFINITIONS.*

10   *For purposes of this Article 56, the following terms have the following meanings:*

11   *"Motor Vehicles" means cars, trucks, vans, motorcycles, mopeds, dirt bikes, all-terrain*

12   *vehicles, other off-highway vehicles, and all other vehicles covered by California Vehicle Code*

13   *Sections 415 and 670, as they may be amended from time to time.*

14   *"Off-street Parking Facility" means  any off-street facility held open for use by the public for*

15   *parking vehicles and includes any publicly owned facilities for offstreet parking, and privately-owned*

16   *facilities for off-street parking where no fee is charged for the privilege to park and which are held*

17   *open for the common public use of retail customers covered by California Vehicle Code Section 12500,*

18   *as may be amended from time to time.*

19   *"Participate" means knowingly engage in one or more acts to conduct, or aid in or abet, a*

20   *Vehicle Sideshow, or knowingly engage in Preparation of a Vehicle Sideshow;*

21   *"Preparation" means engaging in any of the following acts with the purpose of Participating*

22   *in or aiding in or abetting a Vehicle Sideshow:*

23   *(1) One or more motor vehicles and persons arriving at a predetermined location on a public*

24   *street or highway or in an Off-street Parking Facility;*

25   *//*

1       *(2) Two or more persons gathering on, or adjacent to, a public street or highway or gathering*

2   *in an Off-street Parking Facility;*

3       *(3) One or more persons impeding the free public use of a public street, highway,*

4   *or Off-street Parking Facility by acts, words, or physical barriers;*

5       *(4) One or more motor vehicles lining up on a public street or highway, or at an Off-street*

6   *Parking Facility with motors running;*

7       *(5) One or more drivers revving a Motor Vehicle's engine or causing the Motor Vehicle's tires*

8   *to spin; or*

9       *(6) A person standing or sitting in a location to act as a race starter.*

10      *"Present" means any person (1) within 200 feet of the location of a Vehicle Sideshow, or (2)*

11  *within 200 feet of the site of the Preparation of a Vehicle Sideshow.*

12      *"Promote" means the act of a person that assists, encourages, or incites persons to plan,*

13  *organize, Participate in, attend, or gather at the Preparation of a Vehicle Sideshow, or that assists,*

14  *encourages, or incites persons to plan, organize, Participate in, attend, or gather at a Vehicle*

15  *Sideshow.*

16      *"Vehicle Sideshow" means an event in which two or more persons block or impede traffic on a*

17  *public street or highway or in an Off-street Parking Facility, for the purpose of performing motor*

18  *vehicle stunts, motor vehicle speed contests, motor vehicle exhibitions of speed, or reckless driving*

19  *covered by California Vehicle Code section 23109, as may be amended from time to time.*

20      ***SEC. 5603. PROHIBITING THE PROMOTING OF VEHICLE SIDESHOWS AND THEIR***

21  ***PREPARATION.***

22      *No person shall Promote the Preparation of a Vehicle Sideshow or Promote a Vehicle*

23  *Sideshow.*

24  *//*

25  *//*

1   ***SEC. 5604.  PROHIBITING UNLAWFUL ASSEMBLY.***

2   *No person shall assemble with others to block or obstruct the street, sidewalk, highway, other*

3   *public right-of-ways, or private property absent consent of the private property owner, operator, or*

4   *agent, in connection with Preparation of a Vehicle Sideshow or in connection with a Vehicle Sideshow.*

5   ***SEC. 5605. PROHIBITING UNLAWFUL PRESENCE.***

6   *No person shall knowingly be Present at a Vehicle Sideshow or the Preparation of a Vehicle*

7   *Sideshow for the purpose of Participating in or aiding and abetting the Vehicle Sideshow or*

8   *Preparation of the Vehicle Sideshow.  For purposes of this Section 5605, aiding and abetting may*

9   *include promoting, encouraging, supporting, or instigating the unlawful activity.*

10   ***SEC. 5606. EXEMPTIONS.***

11   *Sections 5603, 5604, 5605 do not apply to:*

12   *(a)   law enforcement officials engaged in the course and scope of their duties;*

13   *(b)  members of the media engaged in the course and scope of their duties; and*

14   *(c)  members of the public who are merely observing and/or reporting on the Preparation of a*

15   *Vehicle Sideshow, or on a Vehicle Sideshow, provided they are not Participating or aiding and abetting*

16   *in the Preparation of a Vehicle Sideshow or in a Vehicle Sideshow.*

17   ***SEC. 5607. INTERFERENCE WITH LAW ENFORCEMENT.***

18   *No person shall willfully obstruct, impede, delay, or interfere with law enforcement's*

19   *performance of official duties in connection with Preparation of a Vehicle Sideshow or in connection*

20   *with a Vehicle Sideshow.*

21   ***SEC. 5608. PENALTY.***

22   *Any person who violates Sections 5603, 5604, 5605, or 5607 is guilty of a misdemeanor and*

23   *upon conviction thereof shall be punishable by a fine not to exceed $500, or by imprisonment for a*

24   *period of not to exceed six months, or by both such fine and imprisonment.*

25   *//*

1     **SEC. ~~5602~~5609. AUTHORITY TO ~~REMOVE~~ _IMPOUND_ VEHICLES.**

2     (a)   Any ~~peace officer~~ _law enforcement official_ who arrests _any person engaged in conduct_

3 _that violates_ ~~the operator of a vehicle for conduct in violation of subsection (2) of~~ Section 23109.2 of

4 the California Vehicle Code, as may be amended from time to time, shall impound the vehicle

5 _for_ ~~. For the first incident, a motor vehicle so removed shall be impounded for no less than 14 days but~~

6 ~~not more than 30 days. For the second incident, a motor vehicle so removed shall be impounded for no~~

7 ~~less than 15 days but not more than 30 days. Thereafter, the motor vehicle so removed shall be~~

8 ~~impounded~~ for ~~at least 29 days but not more than~~ 30 days.

9     _(b) Except as specified in California Vehicle Code Section 23109.2(c)-(d), any vehicle_

10 _impounded under subsection (a), above, shall be released only (1) if the District Attorney fails to_

11 _charge the registered owner or operator of the vehicle with violating Section 23109 et. seq. of the_

12 _California Vehicle Code, (2) the District Attorney or the court directs the law enforcement official to_

13 _release the vehicle, or (3) there is no other legal basis to hold the vehicle._

14     _(c) If the District Attorney charges a person with a violation of Section 23109 et. seq. of the_

15 _California Vehicle Code, law enforcement official shall retain the vehicle used in the Vehicle Sideshow_

16 _at least until the conclusion of the criminal action unless the District Attorney or the court orders the_

17 _release of the vehicle._

18     _(d) If the defendant is charged with and convicted of violating Section 23109 et. seq. of the_

19 _California Vehicle Code and the defendant's vehicle was impounded and not subject to return under_

20 _23109.2 of the California Vehicle Code, law enforcement officials may either sell the vehicle at a public_

21 _auction or destroy it if the vehicle has little to no value._

22     (~~b~~_e_)   Nothing in this Article 56 shall override any applicable provisions in the California

23 Vehicle Code.

24     _(f)  Nothing in this Article 56 shall be construed and enforced consistent with the First_

25 _Amendment of the United States Constitution._

1      *SEC. 5610.  PROMOTION OF THE GENERAL WELFARE.*

2      *In enacting and implementing this Article 56, the City is assuming an undertaking only to*

3   *promote the general welfare.  It is not assuming, nor is it imposing on its officers and employees, an*

4   *obligation for breach of which it is liable in money damages to any person who claims that such breach*

5   *proximately caused injury.*

6      *SEC. 5611.  SEVERABILITY.*

7      *If any section, subsection, sentence, clause, phrase, or word of this Article 56, or any*

8   *application thereof to any person or circumstance, is held to be invalid or unconstitutional by a*

9   *decision of a court of competent jurisdiction, such decision shall not affect the validity of the remaining*

10  *portions or applications of the Article. The Board of Supervisors hereby declares that it would have*

11  *passed this Article and each and every section, subsection, sentence, clause, phrase, and word not*

12  *declared invalid or unconstitutional without regard to whether any other portion of the Article or*

13  *application thereof would be subsequently declared invalid or unconstitutional.*

14

15     Section 2.  Effective Date.  This ordinance shall become effective 30 days after

16  enactment.  Enactment occurs when the Mayor signs the ordinance, the Mayor returns the

17  ordinance unsigned or does not sign the ordinance within ten days of receiving it, or the Board

18  of Supervisors overrides the Mayor's veto of the ordinance.

19  //

20  //

21  //

22  //

23  //

24  //

25  //

Mayor Breed; Supervisors Dorsey, Stefani
**BOARD OF SUPERVISORS**

1          Section 3.  Scope of Ordinance.  In enacting this ordinance, the Board of Supervisors

2    intends to amend only those words, phrases, paragraphs, subsections, sections, articles,

3    numbers, punctuation marks, charts, diagrams, or any other constituent parts of the Municipal

4    Code that are explicitly shown in this ordinance as additions, deletions, Board amendment

5    additions, and Board amendment deletions in accordance with the "Note" that appears under

6    the official title of the ordinance.

7    APPROVED AS TO FORM:
      DAVID CHIU, City Attorney

8

9    By:    /s/ Alicia Cabrera
             ALICIA CABRERA
10        Deputy City Attorney

11    n:\govern\as2024\2500017\01783550.docx

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAVID LOY, Cal. Bar No. 229235
ANN CAPPETTA, Cal. Bar No. 354079
FIRST AMENDMENT COALITION
534 4th Street, Suite B
San Rafael, CA 94901-3334
Telephone:   415.460.5060
Email:       dloy@firstamendmentcoalition.org
             acappetta@firstamendmentcoalition.org

Attorneys for Plaintiff JOSE ANTONIO GARCIA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| JOSE ANTONIO GARCIA,<br><br>                Plaintiff,<br><br>        v.<br><br>COUNTY OF ALAMEDA and YESENIA L. SANCHEZ, Sheriff of Alameda County, in her official capacity,<br><br>                Defendants. | Case No. 3:24-cv-03997-RS<br><br>**DECLARATION OF VIJOA LUCAS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:   October 3, 2024<br>Time:  1:30 p.m.<br>Judge: Honorable Richard Seeborg<br>Ctrm:  Courtroom 3 – 17th Floor |

I, VIJOA LUCAS, declare as follows:

1.      I am a resident of unincorporated Alameda County. I make this declaration based on personal knowledge, and if called as a witness I could and would testify competently to the facts stated herein.

2.      I work and reside at Kheystone Stables, in unincorporated Alameda County, which is located approximately 880 feet away from the intersection of Skyline Boulevard and Keller Avenue.

3.      From my workplace and residence, I have seen and heard many sideshows occur at or near the intersection of Skyline Boulevard and Keller Avenue.

4.      Since August 1, 2023, sideshows at or near the Skyline and Keller intersection have occurred at a rate of approximately one to two sideshows per week.

5.      From my workplace and residence in unincorporated Alameda County, approximately 880 feet away from the intersection, I can see that these sideshows would be visible, within 200 feet, from areas of unincorporated Alameda County.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed in Alameda County, California on September 18, 2024.

_____
VIJOA LUCAS